(112 App. Div. 639)

### KOEBEL v. BEETSON.

(Supreme Court, Appellate Division, First Department. April 20, 1906.)

**1. WORK AND LABOR—EXCESSIVE ALLOWANCE.**

Evidence in a suit to establish a claim against the estate of a decedent for services performed by claimant as a professional nurse for decedent examined, and *held*, that an allowance of $25 per week for two years' services was excessive.

**2. SAME—SERVICES BETWEEN PERSONS IN FAMILY RELATION.**

Where a daughter-in-law, after the death of her husband and while she was maintaining a household of her own, rendered services for her father-in-law, there was no presumption that the services rendered were gratuitous.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Work and Labor, §§ 11½, 49.]

3. SAME—QUESTION FOR JURY.

    A daughter-in-law, after the death of her husband and while she maintained a household of her own, rendered services for her father-in-law as a professional nurse during his illness. He repeatedly stated that she would be paid for her services. *Held*, that the question whether he expected to pay and she expected to be paid, so as to entitle her to recover for the value of her services. was for the jury.

    [Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Work and Labor, § 61.]

4. ADMINISTRATORS—CLAIMS—ALLOWANCE—ESTOPPEL.

    In a suit to establish a claim against the estate of a decedent for services performed as a professional nurse for decedent, it appeared that she had presented a claim against the estate for cash advanced, that the claim was allowed, and that she signed a receipt reciting that it was in full of all claims against the estate. Her affidavit in support of the claim for cash advanced stated that the account presented embraced all items of expense due her. Claimant claimed that the administrator desired to reimburse her for the moneys which she had advanced, and that she made a bill for that purpose, and did not observe that the receipt covered anything further. *Held* to authorize a finding that she did not intend to present a claim for anything except the money that she had paid out, and she was not thereby foreclosed from thereafter presenting a bill for her personal services.

    O'Brien, P. J., and Houghton and Patterson, JJ., dissenting in part.

Appeal from Trial Term, New York County.

Action by Rosa Koebel against Frederick W. Beetson, as administrator of Andrew Moll, deceased. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before O'BRIEN, P. J., and PATTERSON, McLAUGHLIN, LAUGHLIN, and HOUGHTON, JJ.

George H. Taylor, Jr., for appellant.

Henry Wetherhorn, for respondent.

LAUGHLIN, J. This is an action against the estate of Andrew Moll, deceased, to recover for services alleged to have been performed by the plaintiff as a professional nurse for the testator for the entire period of 105 weeks from the 1st day of February, 1900, until the 4th day of February, 1902, when the testator died. The plaintiff married the son of the testator, and her husband died in the month of November, 1884, leaving two children, Catherine and Marie E., issue of the marriage. Immediately after the death of his son, the testator took one of his granddaughters to live with him, and a little later on the other. They thereafter made their home with him, and he fully provided for them.

Within seven or eight months after the death of her first husband the plaintiff married again. She and her father-in-law, the testator, were not on friendly terms from the death of her first husband until a few years prior to 1900, when it appears they became reconciled, but were not very intimate even after that. The plaintiff had two children by her second husband, and she lived with them and him at No. 258 West Twenty-Second street. Her second husband became ill, and she studied to be a nurse with her brother, who was a physician, but did not take a course at a training school or obtain a diploma as a trained nurse. She,

however, followed the vocation of a nurse from 1888, obtaining employment in that capacity when she could, and received a diploma as a midwife in 1898. The testator became quite ill with rheumatic pains in his limbs about the 1st of February, and the plaintiff was called in by one of her daughters at his direction. From that time on until his death she continued to attend him whenever summoned, and after being summoned continued to call, as long as her services were needed, morning, noon, and evening, to wait upon him and administer to him, remaining during the evening and all night when necessary. She slept at home, however, and went back and forth, supervising her own household, during the entire period. Her services were required or rendered continuously as are ordinarily those of a trained nurse. At times the testator was quite well and needed but little attention, other than the services rendered by his granddaughters. It was not until the last few months of his life that he became helpless and required some one in attendance constantly.

The evidence shows that he quickly recovered from his first illness, and was about and did not require the services of the plaintiff to any great extent until the latter part of April or fore part of May of the same year, when he was taken ill again. The second illness was severe for about two weeks, but he did not recover until the latter part of June; and during part of this period the testator required rather constant care and attention, and some attention during all of it, and he received it from the plaintiff and from his granddaughters. From June until September the attendance required of the plaintiff was not exacting, and then he had another severe illness, from which, however, he recovered slowly, and was up and about again with assistance in January, 1901. It appears that he was rapidly growing feeble, owing principally to age, for he was nearly 81 when he died, and that he needed more or less assistance in dressing and undressing himself, and in going up and downstairs and about the streets, and that he would occasionally be taken violently ill and require constant attendance. The varying condition of his health is fairly indicated by the visits of the physicians. His regular physician testified that he attended the testator first during the period from May 3, to May 19, 1900, for a chronic rheumatic condition of both lower extremities; that he did not see him again from May 19, 1900, until May, 1901, and then attended him off and on, making nine visits in May, six in June, seven in September, three in October, four in November, one in December, all in the year 1901, and one in January and four in February, 1902. In addition to this it appears that Dr. Varcoe was called in emergencies, because he lived nearby, to attend the testator for convulsions in September, 1900, and made three visits within 24 hours, and was also called once in January, May, October, and December, 1901. Dr. Morris was called seven times after January 2, 1902.

The evidence on the question of the testator's physical condition is not without conflict; but the preponderance of the evidence shows that he did not require the constant attention of a nurse until within a few months of his death, when he became helpless, had bed sores that required dressing, suffered partial paralysis, and was unable to move about in bed or walk alone, and had the assistance of the plaintiff and

others in supporting him in taking necessary exercise. The evidence shows that the plaintiff was devoted in her attendance upon the testator, and that she rendered many services of the nature of those for which a professional nurse is generally required, and which it might not have been pleasant or agreeable for her young lady daughters to perform. But from August, 1901, other assistance was at hand: First, a niece of the testator, who was visiting one of his granddaughters for four weeks, and then his brother, who came specially to wait upon him for six weeks, and after that two men hired by the testator for separate periods, at the rate of $2 and $2.50 per week and board, and Mrs. Beetson's husband also assisted from time to time.

It appears that the plaintiff's second husband was taken ill and obliged to go to a hospital in the spring of 1901, and that he returned to their home on the 7th of June thereafter, and died on the 6th of December, 1901, of cancer of the stomach. After returning from the hospital, her husband was ailing and needed more or less attendance, which he received from the plaintiff and others about the household; and she conceded that she devoted two entire weeks of her time to waiting upon him immediately prior to his death. The plaintiff canceled two engagements at the time she was first called to see the testator, and the evidence indicates that she directed their cancellation, on the ground of his illness requiring her services, in his presence; and it appears from that time until after his death she did not do any professional nursing outside of her own house, other than looking after him. She had been accustomed to let a room in her own house for confinement cases; and after February, 1900, she gave some little time and attention to two confinement cases there. According to her own testimony her husband was janitor of Nos. 256 and 258 West Twenty-Second street, and according to all the other evidence in the case she was janitress of those premises during this entire period, receiving $45 per month therefor. The evidence, however, shows that the only personal services she rendered were in supervising and directing the work, exhibiting the apartments for rent, and collecting the rent. According to her own testimony the regular charge for the services of a midwife, for which profession alone she had a diploma, was $15 per week; and the regular charge for a trained nurse was $25 a week, and she had theretofore been paid from $15, as the minimum, to $25, as the maximum, per week, for services as a nurse or midwife. Other undisputed evidence in the case is to the effect that the services of an ordinary nurse, not graduated as a trained nurse, are worth only $10 or $12 a week.

The plaintiff's claim, as has been seen, was at the rate of $25 per week; and it has been allowed by the jury for every day of the period without deduction. It is manifest that in any view of the case the verdict is grossly excessive. It is also against the weight of the evidence and wholly unsupported by the evidence, in so far as it finds that the plaintiff was entitled to recover at any rate per week for continuous services throughout the services. There is no evidence of an express contract to pay for these services, other than the testimony of the testator's granddaughter Marie, now Mrs. Stoops, which is in substance that on different occasions after the plaintiff had administered to the testator and relieved his pain and suffering he would say to her that

when he got well he would see "that she would be provided for. He would compensate her. He did not use that language. He spoke German as a rule. He told us she would not have to work any more. He would see that she would have a much easier time. She had worked very hard in her lifetime, and he would provide for her, and she would have it a great deal easier than she had before, when he got better. He said he would pay her at times. He spoke about paying her also. He said he would make it all right with her. I suppose the exact language would be that he would make it all right. We, of course, interpreted that he meant he would pay her."

The existence of an express contract to pay for these services, or of any intention on the part of the testator to pay therefor, or knowledge or belief that a claim therefor would be presented, is thoroughly impeached by the other evidence in the case. The testator was a thrifty German. His means were limited. His only income was the rents from two buildings, aggregating $245 per month, from which, evidently, he was obliged to pay for repairs, taxes and interest on some outstanding mortgages. This claim is made for nearly half of that gross income during the entire period. Every witness in the case who testified on the subject, including Mrs. Stoops, who was called by her mother, the plaintiff, and is very friendly to her, testified that the testator would not allow bills to run and could not rest until he paid his obligations. She says he had "an abhorrence of an indebted condition." No claim was ever made by the plaintiff during the lifetime of the testator for compensation for her services. They had financial transactions concerning which her daughter testifies that the testator paid the plaintiff regularly during this period from $3 to $5 per week for furnishing meals to him and her daughters, and for some washing. It further appears by the testimony of the other granddaughter, who flatly contradicts her sister concerning the conversation with respect to compensation, and says that she never heard a suggestion that her mother was to make any claim for services until the presentation of the bill, that the testator expressed the view that her mother would not accept anything for her services, and for that reason he made her presents from time to time, at one time giving her $5 and at another time $20.

Doubtless the testator appreciated the plaintiff's devotion and services to him, and, if he did not reward her fully therefor by presents, would have rewarded her, had he lived. But it is very evident that he believed she was rendering these services gratuitously and to relieve her granddaughters, who for their bringing up were severally obligated to care for the testator in his illness, and out of consideration, also, for the fact that the testator had relieved her of the burden of bringing up her daughters; that he would not have employed plaintiff, either as a trained nurse at $25 per week, or as an ordinary nurse at $10 or $12 per week. Unless, therefore, she could make the contract, not only for herself, but for him also, she was not employed. Moreover, it quite satisfactorily appears that the plaintiff never intended to charge for her services until long after the death of the testator. During his last illness she had expended $60 for him, and early in April, when she was negotiating a lease from the administrator, she mentioned

to him in the presence of his attorney that she had a small claim against the estate aggregating $60, for moneys advanced; and she was advised to present it in the form of a bill, and that whatever was right would be paid. According to the testimony of the administrator and of the attorney, she did not refer to any claim for services at this time, or until after the bill for $60 was paid; and their testimony in this regard is not disputed by her. She made out and presented an itemized bill, and subsequently received a check therefor, and signed a receipt reciting that it was in full of all claims against the estate, and made an affidavit in support of the claim in which it was stated in substance that the account presented "embraces all items of expense or otherwise now justly due her by the said estate."

She questions, but does not deny, the genuineness of her signatures to these papers; and she claims that they were not read over to her, and that she did not understand them. The other evidence shows clearly the genuineness of her signatures, and quite satisfactorily that she knew the contents of the papers and that no deception was practiced upon her. The separate presentation of the claim for $60 for moneys advanced is not accounted for on the theory that it would not be disputed and would be paid promptly, because it appears that she had $2,000 cash on hand, received from her husband, and did not need the $60 at that time. Her change of front is quite clearly accounted for by an item of evidence which her counsel introduced over the objection and exception of the appellant. It appears that, after she presented her claim for $60 against the estate, a partition action was brought by her daughter Catherine, then Mrs. Beetson, against her daughter Marie E., then Mrs. Stoops, for the partition or sale of premises No. 267 West Twenty-Second street, which the testator by his will attempted to devise to Mrs. Stoops, but the title to which was not in him, but in his wife, who died intestate in 1884, leaving these two grandchildren her only heirs. The testator owned certain premises on Seventh avenue, and evidently intended to devise his property equally to the two grandchildren. He devised the Seventh avenue premises to Mrs. Beetson and the Twenty-Second street premises to Mrs. Stoops. If Mrs. Beetson succeeded in the partition action, she would receive about three-quarters of the testator's property, the whole of which was valued at $48,000, instead of one-half, as he intended. The commencement of this partition action caused friction, and the plaintiff evidently took sides with Mrs. Stoops. The claim in suit was not presented until June 26, 1902, after the first claim had been paid and the action in partition had been commenced. The fair inference from the evidence in the record before us is that the commencement of the partition action to accomplish the inequitable result that would attend success was the father of this claim; and that explains the verdict of the jury. The jurors doubtless thought that if Mrs. Beetson was to receive three-quarters of the property, when the testator only intended she should have half, the mother was justified in presenting a claim, three-quarters of which would come out of the interest of the plaintiff in the partition suit, who was taking advantage of a misapprehension on the part of the grandfather concerning the ownership of the title.

But whether this item of evidence was seized upon by the jury and led them to render the verdict sustaining this claim in full is not very material, for in any view of the case the verdict is clearly against the weight of the evidence and should not be permitted to stand. The plaintiff doubtless thought, and had reason to believe, that her father-in-law would leave all his property, as he did, to her daughters, and that any claim that she made would come out of them. Compensation out of the estate cannot be allowed where there was no contract of employment, and no intention on the part of the testator to pay, and no intention on the part of the plaintiff at the time she rendered the services to make a charge, merely because it is possible that the property may not be enjoyed in equal shares by the granddaughters of the testator and daughters of the plaintiff, as he intended.

It follows that the judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event.

McLAUGHLIN, J., concurs.

HOUGHTON, J. I concur in the reversal of this judgment, because upon the proof the verdict is too large; but I do not think this court should say, in effect, that the plaintiff has no cause of action, as is the purport of the opinion of Mr. Justice LAUGHLIN. Whether or not the deceased expected to pay, and the plaintiff expected to be paid, for her services in caring for the deceased in his helpless condition, is a question for the jury to determine. While the plaintiff occupied in a measure an intimate relation to the deceased, she was not a member of his household, nor any blood relation, and the presumption which would apply if she had lived with him, or was a near relative, that the services which she rendered were gratuitous and sprung from love and affection, does not apply to her. She left her own household to perform the services. They were in the line of work that she was accustomed to do. Under these circumstances, a presumption rather arises that there was an intention to pay and to be paid. Added to this presumption are the repeated statements of the deceased that she would be reimbursed for her trouble, or taken care of, or well paid. It seems to me that the plaintiff can and has made a case entitling her to some compensation.

The receipt which she signed is capable of explanation. It is true that there was no claim for services in the bill which she presented. Her explanation that the administrator with the will annexed desired to reimburse her for the moneys which she had paid out, and that she made a bill for that purpose, and did not observe that the receipt covered anything further, authorized the jury to say that there was no intention on her part to present a claim for anything except the money which she had actually paid out for the deceased; and that she was not foreclosed from thereafter presenting a bill for her individual services.

If a new trial should be granted, I do not think the plaintiff should be embarrassed by the broad statements of the main opinion.

O'BRIEN, P. J., and PATTERSON, J., concur.