# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

PENNSYLVANIA R. CO. v. INTERNATIONAL COAL MINING CO.

INTERNATIONAL COAL MINING CO. v. PENNSYLVANIA R. CO.

(Circuit Court of Appeals, Third Circuit. October 6, 1909.)

No. 36.

1. CARRIERS (§ 32*) — INTERSTATE COMMERCE ACT — DISCRIMINATION BETWEEN SHIPPERS—"SIMILAR CIRCUMSTANCES AND CONDITIONS."

In Interstate Commerce Act Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), which prohibits discrimination between shippers under "substantially similar circumstances and conditions," such phrase relates to the circumstances and conditions of carriage only, and does not include matters affecting individual shippers; and a railroad company is not authorized to charge one shipper of coal a lower rate than is charged another shipper between the same terminals, because the former is shipping under contracts extending over a term of years, based on lower rates which were in force when such contracts were made, while the other shipper has no such contracts.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 85; Dec. Dig. § 32.*]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE LAW—DISCRIMINATION IN RATES.

Where a railroad company operating an interstate road treated points on a connecting road which it also operated as within a certain coal district, from all points in which, whether on such line or its own line, it made and published the same rates, such road for freight purposes was a part of its line, and its relations with the owner thereof are immaterial.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 83; Dec. Dig. § 32.*]

3. CARRIERS (§ 36*)—ACTION FOR DISCRIMINATION IN RATES—MEASURE OF DAMAGES.

In an action by a coal mining company against a railroad company under Interstate Commerce Act Feb. 4, 1887, c. 104, § 8, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159), to recover damages because of discrimination in rates made in favor of other shippers between the same terminals, the measure of damages recoverable is the difference between the amount paid by plaintiff and the amount it would have paid at the lowest rate charged on any other shipments carried under substantially the same circumstances and conditions during the same time, and not the difference between the rates paid by it and the average rate paid by any other shipper.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 95; Dec. Dig. § 36.*]

---

4. CARRIERS (§ 36*)—INTERSTATE COMMERCE LAW—ACTION FOR DISCRIMINATION
     IN RATES.

To entitle a shipper to maintain an action against a railroad company
under Interstate Commerce Act Feb. 4, 1887, c. 104, § 8, 24 Stat. 382 (U.
S. Comp. St. 1901, p. 3159), to recover damages for being unjustly dis-
criminated against in rates, it is not necessary that he should have paid
the freight charged under protest.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 95; Dec. Dig. §
36.*]

5. ABATEMENT AND REVIVAL (§ 41*)—TRANSFER OF TITLE BY PLAINTIFF.

A pending action to recover damages is not abated by a judicial sale of
the plaintiff's property, including the chose in action in suit, and proof of
such sale constitutes no defense to the action.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §
212; Dec. Dig. § 41.*]

6. CARRIERS (§ 36*)—INTERSTATE COMMERCE ACT—ACTION FOR DISCRIMINATION
     IN RATES.

A coal shipper, which, with others, was given rebates by a railroad
company in violation of law, cannot maintain an action against the com-
pany to recover damages for discrimination because others were granted
larger rebates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 95; Dec. Dig. §
36.*]

In Error to the Circuit Court of the United States for the Eastern
District of Pennsylvania.

Action by the International Coal Mining Company against the Penn-
sylvania Railroad Company for discrimination. Judgment for plain-
tiff, and both parties bring error. Affirmed.

Francis I. Gowen and Sellers & Rhoads, for Pennsylvania R. Co.
James W. M. Newlin, for International Coal Mining Co.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

BUFFINGTON, Circuit Judge.   In the court below the Interna-
tional Coal Mining Company, herein called the "Mining Company,"
recovered a verdict against the Pennsylvania Railroad Company, herein
called the "Railroad," for alleged unjust discrimination in freight char-
ges. To a judgment entered on such verdict, both parties sued out writs
of error.  We will first consider that of the Railroad.

It seems the Mining Company shipped coal over the Railroad's lines
from its mines in bituminous regions of Pennsylvania to tide water
from 1894 to 1901.  The court excluded evidence bearing on the ship-
ments prior to July 29, 1898, on the ground they were barred by the
statute of limitations.  As to the shipments from that date to April,
1899, the evidence showed the Mining Company paid the same rate
as other shippers.  Consequently there was no recovery for that period.
From April 1, 1899, to 1901, it was conceded the Mining Company paid
a higher rate than other shippers, and the verdict covered shipments
during such period.  The suit is based on section 2 of Act Feb. 4, 1887,
c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), which provides:

"If any common carrier subject to the provisions of this act shall, directly
or indirectly, by any special rate, rebate, drawback, or other device, charge,
demand, collect, or receive from any person or persons a greater or less com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

The Railroad sought to escape liability for such excess freight charges during said last-named period by reason of the following facts: On April 1, 1899, by its published tariff, it advanced its coal freight rates. At that time many shippers from the Mining Company's vicinity to seaboard had outstanding contracts to make coal deliveries over a series of years. These contracts were based on the freight rates in force when they were made. The Railroad, feeling its new and higher rates would entail serious loss on shippers bound by such contracts, herein called "contract coal," continued in the case of such contracts the old and lower freight rates. This was done openly, and, indeed, the Mining Company was informed, if it had such contracts, its coal would be carried at the old rate. It had no such contracts, and therefore it was charged the higher rate for what was called "free coal," and the verdict is based on such differential. The Mining Company's shipments were in part from the Huntingdon & Broad Top Railroad, which was a separate company from the Railroad, but was operated by it. No shipments of contract coal were made from the Huntingdon & Broad Top Railroad. The other shipments of the Mining Company, as well as shipments of contract coal by other shippers, were made from the Clearfield district. The court submitted to the jury the question whether the Huntingdon & Broad Top Railroad was part of the Clearfield district, and its verdict established that such was the case. Now the Railroad sought to draw a distinction between shipments of "contract coal" and "free coal" as above described, requesting the court to charge:

"If the jury believe that it would tend to the benefit of its shippers, and would also tend to secure for it a larger volume of business, the carrier is not guilty of discrimination forbidden by the interstate commerce act, because it carries, at rates of freight in force at the time such contracts were entered into, coal embraced in and shipped under contracts extending for a period of time, even though at the same time it may be charging a higher rate on coal not covered by or embraced in contracts of such a character, provided it extends the benefit of the lower rates to all shippers having such contracts and shipping coal thereunder."

We are thus brought face to face with the question whether the existence of these contracts created a dissimilarity of circumstance and condition under which the service of carriage was rendered. To us the reading of the act is clear. The act contemplates "compensation for any service rendered." Now it is manifest that "service rendered" is the physical service of carriage. Elsewhere it is spoken of as "a like and contemporaneous service." Such service is "service in the transportation," it is a "service in the transportation of a like kind of traffic"; and it is a service in transportation "under substantially similar circumstances and conditions." The law having in view the carriage of freight and equal rates to all, it is clear to us that the words "sub-

stantially similar circumstances and conditions," as used in this sub-section, are those which affect transportation, and not those which involve personal conditions or contractual relations between one particular shipper and the carrier, but are such things only as are circumstances of carriage generally.

In Wight v. United States, 167 U. S. 513, 17 Sup. Ct. 822, 42 L. Ed. 258, it was sought to differentiate the service performed by the different terminal facilities of the two shippers at their respective warehouses; but the court held these were not the circumstances and conditions of the act, but that the circumstances and conditions the act contemplated were those which affected the actual carriage of the freight, using this language:

"It was the purpose of this act to enforce equality between shipppers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay."

And that this phrase, "circumstances of carriage," was a carefully chosen one, limiting the circumstances to such as affected haulage of freight, is shown in Interstate Com. Com. v. Alabama R. Co., 168 U. S. 166, 18 Sup. Ct. 49 (42 L. Ed. 414), where, referring to Wight v. United States, supra, the court say:

"We there held that the phrase 'under substantially similar circumstances and conditions,' as used in the second section, refers to the matter of carriage, and does not include competition between rival routes."

It follows, therefore, that if these circumstances and conditions of section 2 are those which affect haulage, and do not include competition between rival routes, they do not include individual elements affecting individual shippers. The purpose of the section is to afford identity of rate for substantial identity of transportation service, and anything that does not aid in determining what is such substantial identity of haulage does not aid in the application of the section. Evidently it was with this view the court purposely said in that part of its charge here assigned for error:

"It is contended by the defendant that, if shippers have overlapping contracts, they can be classified. The interstate commerce act authorizes the classification of commerce. You can ship coal for one price per ton, iron pipe for another, and pig iron for another. In other words, there is a classification of commerce. Whether they could classify overlapping contracts, schedule them, and make them public or not, is not a question in this case; but it is a question whether or not, when they schedule a certain figure for the transportation of property from one point to another as their tariff rate, and make that public, they are bound by it, and the law is that they cannot have a private agreement, overlapping or not overlapping, which gives a competitor, during the contemporaneous shipments, a return or an advantage over the published rate."

Where, as in this case, the Railroad made a published rate for coal from the Clearfield district to tide water, and the Railroad charged the Mining Company for this haulage the published rate, but charged other shippers for the same haulage lower rates, it is clear it violated the second section, in that, as said by the Supreme Court:

"Two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor."

Whether, indeed, the railroad might have classified contract coal in one class and free coal in another is not before us; for in point of fact it made no such classification and made no differential rates for such coal. What it did was to give a rate on coal from the Clearfield district to seaboard to one shipper and deny it to another, and thereby it violated the express provisions of the statute. The like circumstances and conditions are those which arise within the field of haulage, and not those which exist outside. In this case the Railroad charged to one shipper a rate of haulage, and, the coal of the other shipper being hauled from the same initial locality to the same terminal point, the haulage was identical, and therefore the freight should be the same. To hold otherwise, and to say that because one shipper had made a prior contract, based on lower freight rates, the service was thereby made dissimilar, is not only to contend for a physical non sequitur, but it introduces a practice fraught with possibilities of unjust discriminations and fraudulent rebates.

The next question concerns the shipments of the Mining Company from the Huntingdon & Broad Top Railroad Company. Just what the relation of that road is to the Pennsylvania Railroad we are not exactly shown, either in the proofs or briefs. The proofs do show, however, that the Huntingdon & Broad Top Railroad was within what for freight purposes was known as the "Clearfield district," that the rate from it was obtained from the Pennsylvania Railroad and was the general Clearfield district rate, and that the Mining Company had no dealings or rate quotations from the Huntingdon & Broad Top Railroad. The portion of the charge which reads:

"It is contended by the defendant that all the shipments made by the plaintiff during this time, starting from the Huntingdon & Broad Top Railroad, were not in the Clearfield district, and for that reason they were not a like service rendered under substantially similar conditions and circumstances. The plaintiff contends that the shipments on the Huntingdon & Broad Top Railroad and the point of shipment from which the plaintiff shipped its coal on that road are in the Clearfield district, and that the evidence in this case shows that they were treated as being in the Clearfield district. You will say which is correct. You will say whether the evidence shows it is in the district, or is not in the district. If it is in the district, the shipments from that point would be from the same initial point. If it is not in the district, they would not be from the same initial point. It is a matter for you,"

—is here assigned for error. We find no error in such language. Whatever may have been its relations with the Broad Top Railroad, the Pennsylvania, for freight purposes, chose to include it within the Clearfield district, published rates from it as within such district, quoted such rates to the Mining Company, and collected the same. By such acts the jury had a right to infer the Broad Top Railroad was, so far as the purposes of this case went, and for freight purposes, a part of the Pennsylvania Railroad system. Thus one of the witnesses, speaking of the Broad Top as a separate organization, operated by its own officers, says:

"We didn't know it in freight rates. We didn't ask them for freight rates. We never obtained any freight rates from them. There was no difference in getting a freight rate on Broad Top shipments from a Souman or Clearfield county shipment."

He further said:

"Q. Taking up the matter of the Huntingdon & Broad Top, they were in the Clearfield region? A. Yes; under the tariff rates. Q. And your dealings as to freight were entirely with the Pennsylvania Railroad; that is to say, the Pennsylvania fixed a rate which covered the movement on the Huntingdon & Broad Top? A. Yes. Q. So that was one transaction, without regard to the starting point, and that was in the Clearfield region—one transaction from start to finish, delivery point, with the Pennsylvania Railroad? A. Yes."

Under these proofs we think the court was right in submitting the question to the jury whether shipments over the Pennsylvania Railroad originating on the Huntington & Broad Top were shipments from the Clearfield district and embraced within the rate established for that district by the Pennsylvania Railroad; for by the first section of the act the term "railroad" is defined to mean:

"All the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease."

That being established, the shipments of the Mining Company were entitled to the same rates for like shipments the railroad gave any other like shipper in the Clearfield district, although the shipments of the latter did not originate in that particular part of the Clearfield district covered by the Huntingdon & Broad Top. As a matter of policy it may well be that it would be to the advantage of railways to make such an arrangement; but Congress has not left these matters open to them. It has laid down the broad, simple principle of like rate for like service, and has not authorized the railroad to make other extrinsic considerations a ground for giving different rates for the same service. For, as was said in London & Northwestern Ry. Co. v. Evershed, 3 Appeal Cases, Law Reports, 1038:

"If equality of charges is to be disregarded under any circumstances, that might be made a cloak for making inequalities of charge under unjustifiable circumstances. I do not know whether that was the motive and intention of the Legislature or not, and I do not inquire. What the Legislature has clearly said is that the tolls must be charged equally to all persons under the same circumstances. I think that means under similar circumstances as to the goods, not as to the person. I do not think the person comes into the question at all."

The next assignment of error raises the question of the propriety of the court's refusal of defendant's seventh point, which is:

"The plaintiff is not entitled to recover on all its shipments made in any one month or period of time because of the fact that during such time the defendant transported at a lower rate than it charged the plaintiff a portion of the shipments of some other shipper. If such lower rate was not justified, the amount which the plaintiff is entitled to recover is measured by the difference between the rate per ton which it paid on all its shipments during such period and the rate per ton which the other shipper paid on his or its whole volume of shipments during such period. As there is no evidence from which the jury can estimate the rate per ton paid on all their shipments by the shippers, a portion of whose shipments were carried at lower rates than were charged the plaintiff, there is no basis on which to estimate the amount which the plaintiff is entitled to recover, and it is only, therefore, entitled to recover nominal damages."

This point in effect requested the court to charge, as fixing the measure of recovery, not the lowest rate charged by the railroad to another shipper, but the general average paid on all shipments made by such

shipper. For instance, the railroad contends that, where another shipper's contract coal was charged a less rate than the Mining Company, the recovery was not fixed by the difference between these two rates, but the fixing rate was the average rate paid on all contract coal shipped at the lower rate and all free coal at the higher rate. We think the court was right in denying this point. Whatever may be argued in support of the equity of such a rule, the simple answer is that Congress made no such rule. The purpose of the act is clear, viz., to enforce equality of rate for like service in every case, and the mischief is done when for that service a shipper is charged more than any other shipper is charged for "any service rendered, or to be rendered, in the transportation of passengers or property." So long as it charges a lower rate for any shipment, the law is defeated, although on other shipments it may charge the proper rate.

The next assignment of error raises the question whether the plaintiff can maintain this action in view of the fact, that, with knowledge that it was being charged a higher rate for its free coal than other shippers were charged for contract coal, it nevertheless paid the freight without protest. It is now claimed that the absence of protest accompanying payment of freight is fatal to the right of action. We are of opinion such is not the case. This is not the ordinary case of a suit to recover back a sum of money which has been mistakenly paid and received, but is one where a statute has stamped the receipt of the money as unlawful. Thus section 2 provides:

"Such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful"

—and creates a statutory right of recovery, not of the freight paid, but of damages, viz.:

"Such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act."

From this it is clear that, Congress having conferred a statutory right of action, and having imposed a liability to action by section 8 on the carrier, who shall "do, or cause to be done, or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful," and, we may add, having conferred such right of action without imposing the precedent condition of protest, it follows that the courts cannot by construction impose on the statutory right a condition which Congress has not imposed. It follows, therefore, that this assignment cannot be sustained. This is in harmony with the holding of the Supreme Court in United States Bank v. Bank of Washington, 6 Pet. 17, 8 L. Ed. 299, where it was said:

"Where money is wrongfully and illegally exacted, it is received without any legal right or authority to receive it; and the law, at the very time of payment, creates the obligation to refund it. A notice of intention to recover back the money does not, even in such cases, create the right to recover it back. That results from the illegal exaction of it; and the notice may serve to rebut the inference that it was a voluntary payment, or made through mistake."

The next question raised is that the court erred in refusing to admit in evidence an exemplification of a record of the state court in the

case of Cresson & Clearfield Coal & Coke Company v. International Coal Mining Co., for the purpose of showing a judicial sale of the International Coal Mining Company's claim or chose in action which is the subject-matter of the present suit. We see no reversible error in such ruling by the court. Whatever might be the effect of such judicial sale, the refusal of the court to admit it as a matter of evidence at the trial was not improper. When this suit was brought the right of action was clearly in the International Coal Mining Company, then and now the legal plaintiff. It is alleged such right of action was, after action brought, sold from it by judicial sale. But, waiving the question whether this sale, which was made on a lien obtained within four months prior to bankruptcy, is not void under the law, it is clear the sale would not abate the action. Thatcher v. Rockwell, 105 U. S. 467, 26 L. Ed. 949; Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403. No contention is now made that the right of action did not pass to the trustee, if it was not previously divested by the alleged judicial sale. When a plaintiff in a pending action becomes bankrupt, such action is not thereby abated (Hahlo v. Cole, 15 Am. Bankr. Rep. 591, 112 App. Div. 639, 98 N. Y. Supp. 1049), for section 11 of the act (Acts July 1, 1898, c. 541, 30 Stat. 549 [U. S. Comp. St. 1901, p. 3426]) provides:

"A trustee may, with the approval of the court, be permitted to prosecute as trustee any suit commenced by the bankrupt prior to the adjudication, with like force and effect as though it had been commenced by him."

Accordingly the trustee in this bankruptcy was here made use plaintiff and the action proceeded. Now it seems at some prior stage the defendant sought to abate the action by virtue of this judicial sale, but the court had not sustained such effort. However that may be, we have in the assignment of error now before us the simple offer of the exemplification in evidence. In that forum the question was simply a contest of use plaintiffs, and the defendant had no legal right to inter-ject that question into the trial. If admitted, so far as anything dis-closed in the offer on which the assignment is based is concerned, it could not have affected the defendant. Consequently its rejection con-stitutes no reversible error.

It remains to consider the assignments of error raised by the Mining Company on the writ it has taken to review this judgment. Theoreti-cally it may have a right to have these questions reviewed, but that it has no practical administrative end in view is apparent from the fact that on the other branch of the case it is strenuously insisting on the affirmance of the same judgment it here academically, but not really, asks to have reversed. With this in view, it suffices, without an ex-tended discussion, to say we have examined the assignments involved and find no error. For example, it is here sought to convict the court below of error in overruling challenges of the plaintiff to certain ju-rors. In view of the fact that the jury awarded the plaintiff the full amount of its claim on the evidence before it, and that the plaintiff is insisting on sustaining the judgment on such verdict, it is clear the court's ruling did the plaintiff no harm, and the assignment is void of merit.

It is further contended that there was error in the court's refusing to enter judgment for default of defendant in not producing papers

in obedience to order. The court below was satisfied with the production made, and we find nothing in the record to satisfy us that the court did not understand its own order, or was mistaken in holding it was complied with.

Another assignment involves the right of the plaintiff to recover damages on shipments of coal made before April 1, 1899. In that respect the court ruled that, while there was evidence the Railroad had carried coal for others prior to that date for less than its published rates, the plaintiff itself had received the benefit of such lower rates in common with other shippers, and there was no discrimination against it. We think the court properly disposed of this aspect of the case in its charge, when it said:

"Up until July 1st, if all the evidence is to be believed, the plaintiff, its competitors, and the defendant were all engaged in violating the law—the railroad in giving rebates unlawfully, and the plaintiff in soliciting and accepting the same rebates that its competitors solicited and accepted; and under those circumstances courts do not sit to measure the difference in degree of violation of the law in favor of one party or the other. The question of the money value that each of them received in their violation of the law will not be looked into, nor taken up, nor investigated by courts of justice. Courts of justice are not instituted to measure difference in money value to two people who are engaged in violation of the same law, and therefore the court will not permit them to recover, not for the purpose of relieving the defendant, but because the plaintiff is just as culpable, and under this law, if any criminality attaches, has been just as much a violator of the law, as the defendant. That is the reason I say they cannot recover up to that time."

The next question raised involved the court's restricting plaintiff's right to recover to a sum measured by the difference between the rates charged it and other shippers, and declining to consider alleged advantages enjoyed by the Berwind-White Company in reference to a lease of Harrison's pier, allowance for handling coal there, and on the Altoona Coal & Coke Company, a short connecting line. It suffices to say no such ground of action was declared on, and the court was justified in the exclusion of such features from the jury.

Indeed, after due consideration of these and the other assignments, which we do not deem it necessary to discuss in detail, we find no error by the court below; and its judgment is therefore affirmed, each party to pay costs on its own writ of error.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes