MITCHELL COAL & COKE CO. v. PENNSYLVANIA R. CO.

(Circuit Court, E. D. Pennsylvania. September 9, 1910.)

No. 4.

1. LIMITATION OF ACTIONS (§ 127*)—AMENDMENT OF STATEMENT OF CLAIM—INTRODUCING NEW CAUSE OF ACTION.

Under the settled law of Pennsylvania, a new cause of action cannot be introduced into a pending suit by amendment after the statute of limitations has run against it.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 545; Dec. Dig. § 127.*]

2. LIMITATION OF ACTIONS (§ 99*)—ACCRUAL OF RIGHT OF ACTION—FRAUD.

The fact that the coal freight agent of a railroad company promised a coal company that in the future it would be given as favorable rates as were given to any other shipper, which promise was not kept, but lower rates were afterward given to other competing companies, did not constitute fraud which would prevent the running of limitation against an action to recover damages for the unlawful discrimination.

[Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 99.*]

3. CARRIERS (§ 32*)—DISCRIMINATION IN RATES—WHAT CONSTITUTES—INTERSTATE COMMERCE ACT.

The allowance by a railroad company to certain coal companies shipping over its line of a stated sum per ton ostensibly for the use of trackage owned by such companies and the service of their own locomotives in hauling cars thereon from the rate charged plaintiff, which was also a shipper in the same district under similar circumstances, held an unlaw-

ful discrimination, in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 84; Dec. Dig. § 32.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson C. Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

4. CARRIERS (§ 36*)—INTERSTATE COMMERCE LAW—ACTION FOR DISCRIMINA-TION IN RATES—DAMAGES—LIMITATION BY PLEADING.

In an action against a railroad company under Interstate Commerce Act Feb. 4, 1887, c. 104, § 8, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159), to recover damages for unlawful discrimination in rates on coal shipped between plaintiff and other shippers, where the statement of claim alleged damages in certain sums per ton on shipments from its different mines, its recovery is limited to such sums.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 36.*]

5. CARRIERS (§ 36*)—INTERSTATE COMMERCE ACT—ACTION FOR DISCRIMINATION IN RATES.

To entitle a shipper to maintain an action against a railroad company under Interstate Commerce Act Feb. 4, 1887, c. 104, § 8, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159), to recover damages for being unjustly discriminated against in rates, it is not necessary that he should have paid the freight charged under protest.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 36.*]

6. CARRIERS (§ 32*)—DISCRIMINATION IN RATES—WHAT CONSTITUTES.

A shipper *held* not entitled to recover damages from a railroad company for discrimination in rates because of rebates paid to a shipper from another district; the rate from such district with the rebates deducted being higher than that paid by plaintiff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 84; Dec. Dig. § 32.*]

7. CARRIERS (§ 32*)—INTERSTATE COMMERCE LAW—DISCRIMINATION IN RATES—"CONTEMPORANEOUS SERVICE."

Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), which prohibits a carrier from charging to one shipper a greater or less compensation for a service than is charged to another for a like and "contemporaneous service," services rendered to a complaining and a favored shipper are "contemporaneous" as long as the discriminating rates remain in force, and for the purpose of comparison they need not be rendered on the same day, nor during the same week or month.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 84; Dec. Dig. § 32.*]

8. CARRIERS (§ 36*)—INTERSTATE COMMERCE LAW—ACTION FOR DISCRIMINA-TION IN RATES—DAMAGES.

In an action against a railroad company under Interstate Commerce Act Feb. 4, 1887, c. 104, § 8, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159), to recover damages for discrimination in rates charged on coal from the mines in violation of section 2, plaintiff is entitled only to recover for such discrimination as gave his competitor an unfair advantage in the same market.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 36.*]

At Law. Action by the Mitchell Coal & Coke Company against the Pennsylvania Railroad Company. On motions to amend plaintiff's

statement of claim and exceptions to referee's report.   Motions overruled and exceptions sustained in part.   Judgment for plaintiff.

Joseph Gilfillan and George S. Graham, for plaintiff.
Francis I. Gowen and John G. Johnson, for defendant.

J. B. McPHERSON, District Judge.   This action of trespass is based upon unlawful discrimination in rates upon interstate shipments of coal and coke.   Sections 2, 8, Act Feb. 4, 1887, c. 104, 24 Stat. 379, 382 (U. S. Comp. St. 1901, pp. 3155, 3159).   It was brought on March 14, 1905, and the statement of claim—which was filed in the following November—relies upon the commission of discriminating acts between April 1, 1897, and May 1, 1901.   The Pennsylvania statute of limitations bars an action of trespass after six years from the commission of the unlawful act, and it is evident, therefore, that the right to recover depends upon the plaintiff's ability to show discriminating acts after March 14, 1899, unless the defendant's own conduct has prevented the statute from operating.   It is also evident that if the plaintiff ever had any right of action against the defendant based upon other discriminating acts committed before May 1, 1901, than the particular acts specified in the statement of claim, the statute of limitations became a bar to recovery thereon after May 1, 1907, at the farthest. And it became a bar at that date, no matter in what form the plaintiff should attempt to enforce redress for such other acts—whether by a separate suit, or by pursuing the course that has been actually adopted, namely, seeking to introduce these acts by way of amendment in a former suit.   It is too well settled in Pennsylvania to need discussion that a new cause of action cannot be introduced by amendment after the statute has run.   Noonan v. Pardee, 200 Pa. 474, 50 Atl. 255, 55 L. R. A. 410, 86 Am. St. Rep. 722; Phila. v. Railway Co., 203 Pa. 38, 52 Atl. 184; Mahoney v. Steel Co., 217 Pa. 20, 66 Atl. 90; Lane v. Water Co., 220 Pa. 599, 69 Atl. 1126; Shaffer's Estate, 228 Pa. 36, 76 Atl. 716.

The plaintiff has made several attempts to amend the original statement of claim so as to enlarge its scope by including new and additional discriminating acts.   On April 17, 1907, the first petition to amend was presented, but this was withdrawn on October 30, 1907 (Notes of testimony, page 186), and therefore need not be considered.   A second petition was presented on June 29, 1907, and on July 1, 1907, the court made an order referring the petition and the whole subject of amendment to the decision of the referee, who had meanwhile been appointed by agreement of the parties to take testimony and report his findings of fact and conclusions of law.   His report, however, does not refer to the subject of amendment at all, but he holds that no part of the plaintiff's claim is barred by the statute, and puts the decision upon the defendant's fraudulent misrepresentation and concealment.   On May 2, 1910, a third petition to amend was presented, and this with the second petition is now before the court to be disposed of.   For the reason just given, and upon the authority of the cases cited, the petitions are refused.   Similar applications were recently denied by Judge Fer-

guson in common pleas No. 3 of Philadelphia county in a suit between the same parties involving a different phase of the same dispute.

In this connection it will be convenient to consider the referee's ruling that the statute does not bar any part of the plaintiff's claim because the defendant has been guilty of fraudulent conduct. The statement of claim covers the period between April 1, 1897, and May 1, 1901, and the statute (which was duly pleaded by the defendant) normally bars recovery for any discrimination before March 14, 1899. But the referee was of the opinion that the payment of rebates to other shippers, as well as the amounts of such rebates, "were deliberately concealed from the Mitchell Coal & Coke Company by the Pennsylvania Railroad Company," and that the plaintiff "was misled by the representations of the officials of the Pennsylvania Railroad Company, made with the intention of preventing the Mitchell Coal & Coke Company from ascertaining the fact of the payment of rebates." He further found:

> "69. The Mitchell Coal & Coke Company by its officers made diligent efforts to ascertain whether any rebates or other forms of advantage in the payment of money or otherwise were being. given by the Pennsylvania Railroad Company to the Altoona Coal & Coke Company, Glen White Coal & Lumber Company, Millwood Coal & Lumber Company, Bolivar Coal & Coke Company, and Latrobe Coal Company, or any of them, but the officials of the Pennsylvania Railroad Company deliberately shut off all avenues of information on this point, and fraudulently told the officers of the Mitchell Coal & Coke Company that none of the said other companies obtained or would obtain any advantage, and that the Mitchell Coal & Coke Company would be notified of any reduction in rates made to any of those companies. At the time when such statements were made, rebates under various forms and disguises were being paid to the said companies, and continued to be paid until after May 1, 1901."

These are findings of fact and are entitled to the weight that is usually and properly allowed to such findings; but they are not conclusive, and a careful consideration of the scanty testimony on this subject has convinced me that the referee was mistaken in the inferences he has drawn and in the application of the rule of law upon which he relies. As it seems to me, the utmost scope that can be given to the testimony concerning the declarations by Mr. Joyce, the defendant's coal freight agent, falls short of showing fraud. What happened was this: In March, 1897, Mr. Joyce promised Mr. Mitchell, the plaintiff's president, that in the future the plaintiff should be as well treated as any other shipper. Mr. Mitchell was then settling a claim growing out of shipments prior to March, 1897, and received the following promise from Mr. Joyce (Notes of testimony, p. 146):

> "Now, Mr. Mitchell, I have got leave to settle this claim for less than $70,-000, and, if you will take it at that, I will guarantee you that from this on you will get as good treatment and as good rates as anybody else shipping on the road."

Mr. Mitchell then goes on:

> "Among other things he advised me to move my office to Philadelphia, so I would be in touch with the people, and they could notify me when anything was coming up, any business or lower rates. I settled with him. that day for $69,500. That was in March, 1897. * * *
>
> "Q. And Mr. Joyce told you you would get in the future as low rates and as good facilities as anybody on the road? A. Yes, sir.

"Q. And that they would notify you if there were any additional concessions of any kind made to any shipper. A. He advised me to come here where I could be in touch so I could be notified, and that he would assure me as good rates as anybody else.

"Q. And on the strength of that you made the settlement for $69,500. A. That was part of the consideration; yes, sir. Releasing that claim."

As will appear hereafter, this promise was not kept, and discriminating rates were afterwards given to some of the plaintiff's competitors. But the testimony quoted comprises all that was offered to support the charge of fraudulent concealment, and to my mind it is not sufficient. I am unable to discover the evidence to prove the finding that the plaintiff "made diligent efforts to ascertain whether any rebates or other terms of advantage in the payment of money or otherwise were being given by the Pennsylvania Railroad Company to the Altoona Coal & Coke Company, etc., but the officials of the Pennsylvania Railroad Company deliberately shut off all avenues of information on this point, and fraudulently told the officers of the Mitchell Coal & Coke Company that none of the said other companies obtained or would obtain any advantage, and that the Mitchell Coal & Coke Company would be notified of any reduction in rates made to any of those companies." In brief, the evidence proves this situation: Every shipper was getting the best secret rates he could. The plaintiff had not been as successful as others, and was naturally dissatisfied. At the interview referred to, Mr. Joyce promised the plaintiff that the defendant would thereafter discharge its plain duty as a common carrier, and would not discriminate in favor of others. But the promise was afterwards broken. No subsequent fraudulent conduct or representation is either alleged or proved, and I am at a loss to see how this broken promise can be held to be such fraud as prevents the running of the statute. As the defendant argues—suppose the promise had been to charge only reasonable rates, or to carry safely, and suppose that either of these promises had been broken; could this be properly regarded as fraudulent conduct? Judge Dallas thought otherwise in Despeaux v. Railroad (C. C.) 81 Fed. 794, and the defendant's brief cites several other decisions to the same effect. If then, as I think, the broken promise made by the defendant's agent was not in itself fraudulent, and if there is no evidence of any subsequent fraudulent conduct or representation, it can make no difference which of the two rules of law is applied to which the Supreme Court of Pennsylvania refers in Smith v. Blachley, 198 Pa. 173, 47 Atl. 985, 53 L. R. A. 849. Mr. Justice Mitchell, in discussing the subject, referred to these rules as follows:

"It is said in general that in cases of fraud the statute runs only from discovery, or from when with reasonable diligence there ought to have been discovery. But a distinction is made in regard to the starting point of the statute between fraud completed and ending with the act which gives rise to the cause of action, and fraud continued afterwards in efforts or acts tending to prevent discovery. On this distinction there are two widely divergent views. It is held on the one hand that the fraud, though complete and fully actionable, nevertheless operates as of itself a continuing cause of action until discovery; while, on the other hand, it is held that, when the cause of action is once complete, the statute begins to run, and suit must be brought within the prescribed term, unless discovery is prevented by some additional and af-

firmative fraud done with that intent. The United States courts have adopted the first view in treating the limitation of actions in the bankruptcy acts. Bailey v. Glover, 88 U. S. 343 [22 L. Ed. 636]; Traer v. Clews, 115 U. S. 528 [6 Sup. Ct. 155, 29 L. Ed. 467]. On the other hand, in Troup v. Smith's Ex'rs, 20 Johns. [N. Y.] 33, it was held that in a court of law the statute runs from the act 'whether there was a fraudulent concealment or not so as to prevent the plaintiff discovering the fraud,' and Chief Justice Spencer, said that even in a court of equity the plaintiff must fail, 'as the concealment of the fraud is not imputed to the testator. What he did was visible and what he neglected to do would or might have been discovered by repairing to the land.' This view appears to be still held in New York. Miller v. Wood, 116 N. Y. 351 [22 N. E. 553], and in other states. In many states, however, the decisions are so influenced by statutory provisions that they afford us little light on the subject as governed by the common law."

And he sums up the discussion on page 179 of 198 Pa., page 987 of 47 Atl. (53 L. R. A. 849):

"We regard the distinction as sound, well marked, and in harmony with the spirit and letter of the statute. The cases which hold that where fraud is concealed, or as sometimes added, conceals itself, the statute runs only from discovery, practically repeal the statute pro tanto. Fraud is always concealed. If it was not, no fraud would ever succeed. But, when it is accomplished and ended, the rights of the parties are fixed. The right of action is complete. If plaintiff bestirs himself to inquire, he has ample time to investigate and bring his action. If both parties rest on their oars the statute runs its regular course. But, if the wrongdoer adds to his original fraud affirmative efforts to divert or mislead or prevent discovery, then he gives to his original act a continuing character by virtue of which he deprives it of the protection of the statute until discovery."

I think, therefore, that the referee was in error upon this point, and that the plaintiff can only recover in respect of such injurious discriminating acts as were committed after March 14, 1899, and are specified in the statement of claim. No amendment having been allowed, the cause of action remains as the plaintiff stated it several years after the injurious acts were committed, and eight months after the suit was actually begun.

The acts declared upon are in substance as follows: Plaintiff owned bituminous coal lands in the Clearfield region of Pennsylvania and operated six collieries thereon, four of them in Blair county along the main line of the defendant, and two in Cambria county along the Cambria & Clearfield Railroad, a branch of the defendant's system. Of the first four collieries the plaintiff operated Gallitzin and Columbia No. 4 from April 1, 1897, to May 1, 1901, Columbia No. 7 from July 20, 1899, to May 1, 1901, and Bennington from October 30, 1899, to May 1, 1901. Of the other two, Hastings was operated from April 1, 1897, to May 1, 1901, and Columbia No. 6 from December 8, 1898, to May 1, 1901. Among other operators in the Clearfield region were the Altoona Coal & Coke Company, the Glen White Coal & Lumber Company, and the Millwood Coal Company. The Latrobe region lies immediately west of the Clearfield region, and in this were situated the collieries of the Latrobe Coal & Coke Company and the Bolivar Coal & Coke Company. Interstate shipments of coal and coke were made from plaintiff's collieries and from the collieries of the other five companies during the period from April 1, 1897, to May 1, 1901, and the plaintiff complains of discrimination against its business and in favor

of the rival shippers just named. The method of discrimination is described as follows: The Altoona Company and the Glen White Company each owned a short line or branch from their respective operations to the defendant's road, and also owned a locomotive which hauled the loaded or empty cars to and from the defendant's road. The Millwood Company had no branch, but had a switch or connection with its mine tracks, and along this switch its own locomotive hauled the empty or loaded cars. The Latrobe Company owned a branch, but had no locomotive, and the defendant's own engines hauled the loaded and empty cars. The Bolivar Company's colliery was reached over a branch owned by the defendant itself, and the loaded and empty cars were hauled by the defendant's own locomotives. All the plaintiff's collieries were connected with the defendant's road by short lines or branches owned by the plaintiff, but the motive power was furnished by the defendant upon them all, except that for a year and seven months (from October 1, 1899 to May 1, 1901) the plaintiff owned a locomotive at Gallitzin colliery, and used it to move the empty and loaded cars.

Having thus outlined the situation, plaintiff's statement goes on to compare the Altoona, the Glen White, and the Millwood collieries with the Gallitzin colliery between October, 1899, and May, 1901, averring that these four reached the same general markets, and that the defendant in transporting their products for these companies performed like and contemporaneous service for like traffic under substantially similar circumstances and conditions. The statement then charges that from October, 1899, to May, 1901, the defendant allowed the Altoona, the Glen White, and the Millwood Companies a rebate of 15 cents per ton on all the coal and coke passing over their lines or branches connecting these collieries with the defendant's road, but allowed no rebate or drawback or compensation whatever upon coal and coke shipped during the same period from the Gallitzin colliery. Plaintiff then compares the coal and coke shipped from its five other collieries during the whole period from April, 1897, to May, 1901, and also shipped from Gallitzin between April, 1897, and October, 1899, with the coal or coke shipped from the Latrobe and the Bolivar collieries, averring that the products from these eight operations reached the same general markets, and that the defendant performed for all of them like and contemporaneous service in transporting like traffic under substantially similar circumstances and conditions. Discrimination is charged because the defendant allowed the Latrobe and the Bolivar collieries a rebate of 10 cents per ton, but allowed no rebate or compensation of any kind to the plaintiff. Two specific charges are then made: (1) That for the coal and coke shipped from Gallitzin between October, 1899, and May, 1901, the defendant charged and collected from the plaintiff a greater compensation, namely, 15 cents per ton, than it charged and collected from the Altoona, the Glen White, and the Millwood companies; and (2) that for the coal and coke shipped from the five other collieries of the plaintiff and also from Gallitzin before October, 1899, the defendant charged and collected a greater compensation, namely, 10 cents per ton, than it charged and collected from the Latrobe and Bolivar companies.

This is a sufficient summary of the statement of claim. It contains precise and definite charges, and, as it contains no others, the plaintiff should be confined to these. The payment of the sums complained of —15 cents and 10 cents per ton respectively—is conceded, but the defendant explained it as mere compensation for trackage or for services rendered by the favored shippers. Whether it was such a compensation as the defendant might lawfully pay, or whether it was an unlawful rebate in disguise, was a question of fact, and the referee has decided it in favor of the plaintiff. With this finding I agree. There is some room for doubt in the evidence on this point, but, when all is said (and much has been ably said on behalf of the defendant), I see no sufficient reason to differ from the referee's conclusion. The defendant made no effort to prove the money value that might properly be put upon the use of the various branches, or upon the services rendered by the locomotives of the favored shippers, and the failure to throw light upon this obviously important matter is, I think, not without significance. There was a good deal of other evidence also upon one side or the other of the question under consideration, and, as I have already said, I agree that upon the whole evidence the payments referred to were unlawful rebates. To what extent did they injure the plaintiff? The statement of claim replies that upon all shipments made from Gallitzin between October, 1899, and May, 1901, the plaintiff has been injured 15 cents per ton, and that upon all other shipments the injury amounts to 10 cents per ton. The referee, however, held that the measure of damage was the sum paid to the Altoona Company, and applied it practically to all of the plaintiff's shipments from all its collieries. This it seems to me was a clear mistake. It gives the plaintiff what it did not sue for, and has not lawfully claimed; and the judgment to be entered hereafter must be computed in accordance with the sums demanded by the pleadings.

The defendant raises several other objections that may be briefly considered. It is suggested that the Interstate Commerce Commission should have been first applied to, and that the Circuit Court (for the present at least) has no jurisdiction of the suit. The recent decision of this court in Morrisdale Coal Company v. Pennsylvania Railroad Company (C. C.) 176 Fed. 748, is referred to in support of this proposition. That case is now sub judice in the Court of Appeals, and obviously, as it seems to me, I should not repeat a ruling which may shortly be declared erroneous. For the immediate purpose, I shall therefore hold formally that the circuit court should exercise jurisdiction of the pending controversy.

It is objected, further, that the plaintiff's right to recover is either wholly or partly taken away by its failure to make protest at the various times when it paid the higher rates charged against its shipments. In reply, it is enough to cite Pennsylvania Railroad Company v. International Coal Mining Company, 173 Fed. 1, 97 C. C. A. 383, where the Court of Appeals of the Third Circuit has decided that such an objection is not valid. That the plaintiff cannot recover in respect of any shipments upon which it also received unlawful rebates is not denied, but there is a dispute about dates on this subject. The referee has

found as a fact that no rebates were paid to the plaintiff after April 1, 1899, and I am asked to say that the evidence points to such payments as late as April 1, 1900. Undoubtedly there is evidence that would justify that conclusion, but there is also conflicting evidence, and I must decline to set aside the finding of the referee contained in the sixty-seventh paragraph of his report.

So far as the payments to the Bolivar Company are concerned, I am of opinion that they did the plaintiff no harm, and cannot furnish a basis for recovery. The Bolivar Company shipped no coal, its business being confined to coke, and upon coke the tariff rate from the Latrobe region, in which the Bolivar colliery was situated, was 20 cents per ton higher than the tariff rates charged against the plaintiff. Assuming, therefore, that the payments to the Bolivar Company were rebates, they did the plaintiff no harm, because they left the actual rate on coke paid by the Bolivar Company higher than the rate paid by the plaintiff on like shipments. And similar facts are true concerning the rates upon coke shipped by the Latrobe Company during the whole period covered by the action, and also upon coal shipped by the same company before April 1, 1899. Conceding that the payments received by this company were rebates, they did the plaintiff no harm before April 1, 1899. After that date, the defendant charged the same rates on coal from both the Latrobe and the Clearfield regions, and the rebate on coal then became injurious.

The defendant also argues that in computing the damages "contemporaneous service" must be confined to shipments made for the plaintiff and for the favored shippers at the same, or practically the same, moment of time; and that shipments a week apart, or certainly a month apart, would therefore be too remote. No doubt "contemporaneous" means "at the same time," but at the same time with what? A term is evidently implied which must be looked for in the context and in the subject-matter of the statute. In my opinion the well-known evil aimed at in section 2 requires the court to hold that the implied term in the comparison is the offending rates, making the word to mean, "at the same time with the offending rates," and that, as long as these rates remain in force, the services rendered to a complaining and to a favored shipper are "contemporaneous" within the meaning of the statute. As far as I am aware, there is no decision upon this subject, but Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, furnishes, I think, some inferential support to the construction just given.

It is further objected that the referee did not properly discriminate among the plaintiff's shipments, but computed damages on all of them without regard to the question whether they reached the same market that was reached by the coal or coke of the favored shipper. This objection I regard as well taken. Discrimination can only injure a complaining shipper if his rival has been given an unfair advantage in the same market, and I do not see why a plaintiff should be allowed damages on coal shipped, for example, to Baltimore, because a rival had received rebates on coal shipped to Newark. It may not be always easy to determine what is the same market, but, if difficulties arise, they

must be met and overcome in the usual way. It is obvious that different points of destination might belong to the same market, and that many other considerations may enter into the problem. But other questions of fact are often complicated, and, although they may be hard to solve, they are continually demanding solution. This question probably belongs to that class, but I see no rough and ready way out of the difficulty. If the parties cannot agree upon this point, there will have to be a further inquiry.

The defendant also objects that the service rendered to the plaintiff and to the favored shippers was not "like" in many instances, because not only were the points of destination different, but also because these points could be reached over various routes that were covered in part by other carriers. This objection may have a bearing upon the question whether the rival shippers were seeking the same market. Rates over one route might admit to the market, while rates over another route might shut the traffic out. This aspect of the matter has not been considered, and (as I understand) the evidence does not show by what route a shipment was actually made, but merely that it was possible to reach certain destinations over more routes than one. If the objection is thought to have any bearing upon the question whether the payments to the favored shippers were rebates, it seems sufficient to reply that the payments were made without reference to destination or route, and were apparently not influenced by either consideration.

An application to allow counsel fees to the plaintiff was presented to the referee, and is now before the court. Nothing was said about it on the argument, however, and the matter may stand over until judgment comes to be entered in accordance with the above opinion. A motion to enter judgment may be made at any time after the necessary computation has been made.