PUBLIC UTILITIES COMMISSION

*vs.*

UTTERSTROM BROTHERS, INC. ET AL.

Kennebec.     Opinion, September 12, 1939.

*Frank M. Libby*, for the Commission.
*Albert E. Anderson*, for respondents,
*Locke, Campbell & Reid* ⎱
*Raymond S. Oakes* ⎰ of counsel for respondents.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

MANSER, J.   On exceptions to rulings and decision of the Public Utilities Commission.

The Great Atlantic and Pacific Tea Company, hereafter called by its more familiar designation, A. & P., maintains numerous retail stores throughout the State of Maine. It owns and operates a warehouse at Portland and employs several contract carriers to transport over the highways merchandise to its stores. These contract carriers are the respondents in the present case. On its own initiative, the Public Utilities Commission ordered a hearing upon the rates charged for transportation service by the respondents upon the ground that they were less than those prescribed by a general order adopted by the Commission under authority of Sec. 5 (4) P. L. 1933, Chap. 259, as amended by P. L. 1935, Chap. 146.

The Commission ruled that the respondents were operating in competition with common carriers and were performing substantially the same or similar service, and the respondents were ordered to cease and desist from transporting freight and merchandise unless at rates not less than the minimum rates of common carriers.

Two classes of service to shippers for the transportation of goods by the use of motor trucks on the highways are recognized and provided for by the laws of our state. P. L. 1933, Chap. 259, as amended by P. L. 1935, Chap. 146. One is the transportation by trucks operated by common carriers. Such carriers are required to serve the general public. They operate over designated routes and upon fixed schedules and transport the goods of any shipper. The other is the transportation service furnished to an individual shipper by a private contract carrier.

Common carriers must secure permission from the Commission to operate upon the highways, and must show that public necessity and convenience require and permit such operation. They must file schedules of rates, which are subject to the approval of the Commission, and which rates so fixed must be paid by the shipper.

Contract carriers must likewise obtain a permit from the Commission. When the provisions of P. L. 1933, Chap. 259, became effective these respondents by its terms became entitled as a matter of right to such permit, as they were engaged in the business of contract carriers, as defined in the act, prior to March 1, 1932.

Sec. 5 (D) of said Chap. 259 provides:

"The commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this state, and the commission shall prescribe minimum rates and charges to be collected by contract carriers which shall not be less than the rates charged by such common carriers for substantially the same or similar service."

The position of the respondents is that they are not in competition with common carriers as described in the section quoted above, that they do not render substantially the same or similar service as a common carrier and are, therefore, not within the purview of the act with relation to rates.

It is contended by the respondents that there are fundamental distinctions between the service rendered by them to the A. & P. and the service of common carriers. Being under no obligation to serve anyone but the A. & P., an entirely different scheme of transporta-

tion is set up. The facilities which would be necessary if the general public were to be served, and the expense attendant thereon, are eliminated. They serve but one shipper. They are provided with full employment for their trucks by that shipper. The compensation paid is a matter of private contract mutually agreed upon and satisfactory to both parties. There is but one paymaster. The work is more efficiently carried on. The respondents are not required to operate over regular routes or on fixed schedules. The trucks are operated upon a schedule to meet the shipper's needs, and practically 24 hour service is provided. Bread, fruit and perishable goods are routed for quick delivery to the stores of the shipper in various localities. The A. & P. maintains an organization and adopts methods to facilitate the transportation, which lessen the cost of operation to the contract carrier. The public is protected by the same regulations as to safety appliances, equipment, weight, height, load, and operation of the trucks as apply to common carriers. The number of trucks on the highway is not increased, and may well be less. It is urged that the convenience of highway transportation direct from warehouse to the various stores, with no other goods carried, and no other deliveries to make, places the service upon an entirely different plane, which could not be provided by common carriers. These distinctions, with other elements mentioned and recognized by the Commission in its findings, it is claimed demonstrate that there is no competition and no substantial similarity; and that to compel higher rates will not transfer the business to common carriers as their service is not adapted to the needs of the A. & P., but will force the shipper to transport the goods himself, via the highways, to the destruction of the respondents' business, or if such transportation proves infeasible, to needlessly add to the cost of goods to the consumer.

The respondents contend that certain statements of the Commission in its findings, and upon which its conclusion that competition and similarity of service are shown, demonstrate exactly the opposite. They call attention in particular to the following excerpts:

"The contract type of carrier service is better adapted to the need of The Great Atlantic and Pacific Tea Company." Again: "It is perfectly true that it is probably more convenient for the Company to use contract carriers which it can order in at various hours

of the day, as the shipments are made up and prepared for delivery to the carrier." And again: "It is probably doubtful if the business could be expedited nearly as satisfactorily as under the present contract carrier method." Again, the respondents assert that loading is as much a part of transportation as is movement. The A. & P. dealing with contract carriers has adequate room in its warehouse to load vehicles, because trucks are supplied as and when needed, while the Commission finds that such room is not available when dealing with common carriers unless such carriers depart from their present service.

Respondents acknowledge that certain trucking concerns operating as common carriers furnish transportation to the A. & P. but assert that the record shows that they are used but little as compared with the total volume of transportation, and such use is at considerable inconvenience in order to care for stores in a few scattered localities and in areas not adequately served by the contract carrier system, while the contract carriers are used to provide the great volume of transportation in other areas because the flexible nature of the system is peculiarly adaptable to the needs of the shipper.

Reference is also made to the findings by the Commission that the personal relations between contract carriers and the company enable delivery of merchandise in the absence of the consignee, and that the system in general provides a saving of costs to the carriers in bookkeeping, collection of accounts, operation of terminals and solicitation of business, and comment is that all these elements show substantial dissimilarity of service.

These contentions of the respondents must be sustained. The finding of the Commission is based solely and squarely upon the assumption that carriers who receive loads at the warehouse and transport them over the highways are engaged in substantially the same business, and that the transportation of goods for such a shipper as the A. & P. must be done at common carrier rates, regardless of the inability of common carriers to perform the service adequately, regardless of convenience to carrier, shipper and consignee alike, and regardless of cost or public welfare.

The legislature authorized both contract and common carrier methods of highway transportation. It permits contract carriers

to operate, receiving compensation mutually agreeable to the parties, so long as such contract carriers do not compete with common carriers in substantially similar service, yet every contract carrier and every common carrier must necessarily operate trucks on the highways, travel to the warehouse, procure loads and deliver goods to consignees, which acts or functions form, according to the reasoning of the Commission, the criterion of similar service. It can not be said to be the intent of the legislature that any contract carrier who exercises the right to load, transport and deliver goods *ipso facto* becomes a competitor of common carriers and performs substantially the same service.

The brief for the Commission relies on cases construing the discriminatory provision of the Interstate Commerce Act. It cites *Wight* v. *U. S.*, 167 U. S., 512, 17 S. Ct., 822; *Penn. RR Co.* v. *International Coal Mining Co.*, 173 Fed., 1; *I. C. C.* v. *B. & O. R. R.*, 225 U. S., 326, 32 S. Ct., 742, 747, as restricting the interpretation of "like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions" to the single element of carriage between given points.

It is to be borne in mind, however, that the act there considered was one designed to prevent common carriers from granting preferential rates to favored customers. As between a common carrier and its shippers, the law forbade discrimination. In *I. C. C.* v. *B. & O. R. R.*, supra, the court took occasion to point out:

> "It must be kept in mind that it is not the relation of one railroad to another with which we have any concern, but the relation of a railroad to its patrons, who are entitled to equality of charges."

Such is not the case here. It is the relation of one carrier to another, under different classifications.

The right of contract service thus granted should not be lightly ignored and all the terms and conditions of the contract should be considered in determining the question of substantial similarity of purpose.

The case of *Wight* v. *U. S.*, supra, was one of offering a special inducement to a shipper by which he was allowed a rebate to cover

the cost of cartage from the depot to his warehouse. This was done to secure a transfer of the business from a competing railroad. Another shipper of like goods between the same points was charged the established tariff. The opinion points out:

> "The wrong prohibited by the Section is a discrimination between shippers. It was designed to compel every carrier to give equal rights to all shippers over its own road and to forbid it by any device to enforce higher charges against one than another."

That the construction of Sec. 2 of the Interstate Commerce Act against discrimination was limited to cases specifically arising thereunder is emphasized by the court in its further statement:

> "It may be that the phrase 'under substantially similar circumstances and conditions' found in section 4 of the Act, and where the matter of the long and short haul is considered, may have a broader meaning or a wider reach than the same phrase found in section 2. It will be time enough to determine that question when it is presented. For this case it is enough to hold that that phrase, as found in section 2, refers to the matter of carriage, and does not include competition."

The Circuit Court case of *Penn. RR.* v. *International Coal Co.*, supra, was based upon the same section of the Interstate Commerce Act, and to like effect.

The principles laid down in the cases sustaining the rulings of the I.C.C. under the law prohibiting discrimination by common carriers in their dealings with their patrons, were not regarded as controlling or as precedents by the I.C.C. itself when that Commission considered applications for contract carrier permits. The issuance of such permits depended upon whether there would ensue competition with a service similar to that of common carriers, a question analogous to the one now under scrutiny. The following instances cited by the respondents of permits granted in 1938, are illustrative:

In *Ryan* Contract Carrier Application 9-ICC, 537:

> "Common carriers cannot give the cooperation and the individual service which a contract carrier renders and which is re-

quired in the transportation of beer. A contract carrier is at the call and demand of the other contracting party."

In *Martin* Contract Carrier Application 9-ICC, 542, appears the following:

"By having his equipment entirely at the disposal of the shipper, applicant is able to render a more prompt and convenient service than can ordinarily be rendered by a common carrier serving the public generally. . . . He is able to meet the shipper's demands for transportation speedily and upon short notice."

In *Arbaugh* Contract Carrier Application 9-ICC, 299, it was stated:

"As a consequence of several years experience in serving one shipper, applicant has been able to meet the requirements for dependable and prompt delivery. Such service is well adapted to the shipper's needs and has been very helpful in enabling shipments to move with regularity from the plant to the destination."

In *Dyer & O'Hare Co.*, T-6003, the Public Service Commission of Missouri in 1938, in acting upon contract carrier application, was required to construe a statute passed by the legislature in 1937, which became a part of R. S. of Mo., Secs. 5270 and 5271, and which contained the following provision:

"In determining whether or not a permit should be issued, the Commission shall give reasonable consideration to the transportation service being furnished by any railroad, street railroad, motor carrier, or contract hauler, and the effect which such proposed transportation service may have upon other transportation service being rendered."

The following statement by the Commission shows that it passed upon a situation like that under consideration:

"The service proposed by this applicant is different from that offered by common carriers. Perforce a common carrier cannot do the things this applicant proposes. It must of neces-

sity on account of its many patrons maintain regularly established schedules while applicant can stand by with its entire fleet of equipment for a 24 hour demand service. The common carrier must maintain its depots and warehouses, its agents and solicitors while this applicant with its one client avoids all of these requirements, and is able to render a type of service to the shipper which would require the facilities of several common carriers to duplicate. . . . The applicant owing to its close personal relationship with its one shipper is given store keys and when the necessity arises can go into the many stores alone to complete deliveries or can without further instruction from its main office transport from one store to another excess commodities. These many things make up a service peculiarly adapted to the type of business carried on by this particular shipper."

It is further contended in the brief for the Commission that its rulings were based upon its findings of fact and the court, though it may disagree with the Commission, has no right to sustain exceptions on questions of fact if there be any evidence to sustain the findings, citing *Hamilton* v. *Power Co.*, 121 Me., 422, 117 A., 582; *Gilman* v. *Telephone Co.*, 129 Me., 243, 151 A., 440; *P. U. C.* v. *Water Comm.*, 123 Me., 389, 123 A., 177. Such is undoubtedly the law. The facts as to the kind of service rendered by the contract carriers in the present case are not in dispute. The Commission frankly stated them as they appear of record. Nor is there controversy as to the character of the service which is, or would be, rendered by common carriers. The Commission, however, upon the undisputed facts, was required to interpret the statute and apply the law to the facts. Thus a legal question was presented. The Commission did not correctly interpret the meaning and intent of the law. As said in *Gilman* v. *Telephone Co.*, supra:

"Whether, on the record, any factual finding, underlying order and requirement, is warranted by law, is a question of law, reviewable on exceptions."

The exceptions on the questions herein discussed must be sustained. The respondents, in event their exceptions in the foregoing respects were not sustained, and the law were construed in ac-

cordance with the holding of the Commission, raised objections to the constitutionality of the statute, but these exceptions, in view of this opinion, need no consideration.

*Exceptions I and IX sustained. The Clerk of this Court to so certify to the Clerk of the Public Utilities Commission, and to the Clerk of the Superior Court for Kennebec County in accordance with P. L. 1933, Chap. 6.*