CENTRAL MAINE POWER COMPANY

*vs.*

PUBLIC UTILITIES COMMISSION

RE: INCREASE IN RATES

Kennebec.　Opinion, November 7, 1957.

*Everett Maxcy,*
*William H. Dunham,*
*Leonard A. Pierce,*
*Vincent McKusick,* for plaintiff.

*Richard B. Sanborn,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

WILLIAMSON, C. J. This rate case is before us on exceptions by the Central Maine Power Company to the denial by the Public Utilities Commission of its request for an increase in electrical rates. Rates under the statute must be just and reasonable. R. S. Chap. 44, Sec. 17. Questions of law may be raised by exceptions to the ruling of the Commission on an agreed statement of facts or, as here, on facts found by the Commission. R. S. Chap. 44, Sec. 67.

The basic issue before the Commission was well stated in the Company's brief, "What were just and reasonable rates required by the Company in order to provide a fair return on the reasonable value of all of the Company's property used or required to be used in its service to the public?"

Two of the major points necessary to a solution of the issue were disposed of by the Commission without complaint of the Company. First, the rate base was established at $179,250,000, and second, the gross revenues produced by the existing rate schedules were not in dispute. Thus the issues were narrowed to the determination of expenses to be charged against revenues, and of the amount required to constitute a fair return on the rate base.

There are certain fundamental principles to be kept in mind in passing upon exceptions to a decree of the Public Utilities Commission. (1) Questions of law, and only questions of law, are presented by exceptions. R. S. Chap. 44, Sec. 67. (2) The facts are found by the Commission and not by the Court. (3) The burden is upon the complaining party, here the Company, to establish the error of law. (4) Errors of law are committed if the Commission: (a) erroneously interprets and applies by its ultimate ruling the law applicable to the facts found by it, or, (b) in its findings of fact, which form the basis of such ultimate ruling, misinterprets the evidence, or, (c) makes such findings of fact unsupported by substantial evidence. (5) Further, the rates must not be confiscatory in violation of the due process clauses of the State and Federal Constitutions. State, Art. I, Sec. 19; Federal, 14th Amendment.

"The Commission is the judge of the facts in rate cases such as this. This court under the statute which created it is only a court to decide questions of law. It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine

what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets the evidence before it, then the question becomes one of law."

*N. E. Tel. & Tel. Co.* v. *Public Utilities Comm.,* 148 Me. 374, 377, 94 A. (2nd) 801.

The above statement was quoted with approval in *Central Maine Power Co.* v. *P. U. C.,* 150 Me. 257, 261, 109 A. (2nd) 512. Among other cases illustrating the "substantial evidence" rule are: *Hamilton* v. *Power Co.,* 121 Me. 422, 117 A. 582; *Public Utilities Commission* v. *Utterstrom,* 136 Me. 263, 8 A. (2nd) 207; *Public Utilities Commission* v. *Gallop,* 143 Me. 290, 62 A. (2nd) 166; *Public Utilities Commission* v. *Johnson Motor Transport,* 147 Me. 138, 84 A. (2nd) 142; *Chapman, Re: Petition to Amend,* 151 Me. 68, 116 A. (2nd) 130; *State of Maine* v. *Ballard,* 152 Me. 158, 125 A. (2nd) 861.

In an earlier statement of the rule Chief Justice Cornish, speaking for the court, said in *Public Utilities Commission* v. *Lewiston Water Comm.,* 123 Me. 389, 390, 123 A. 177:

"This Court is not an Appellate Court from the Public Utilities Commission, to retry questions of fact already tried and decided by that tribunal. The only power of review relates to questions of law. 'Questions of law may be raised by alleging exceptions to the rulings of the Commission on an agreed statement of facts, or on facts found by the Commission.' (Now R. S. Chap. 44, Sec. 67). 'Facts found by the Commission are not open to question in this Court unless the Commission should find facts to exist without any substantial evidence to support them, when such finding would be open to exceptions as being unwarranted in law.' *Hamilton* v. *Caribou Water, Light and Power Company,* 121 Maine, 422, a case which determines the power of this court on review in this class of cases and establishes the practice in such proceedings."

We are not here concerned with the provisions for additional court review enacted in 1953 under which no case has yet been brought to the Law Court. R. S. Chap. 44, Sec. 69. The present case is governed by Section 67, unchanged in the pertinent language since first enacted in Laws of 1913, Chap. 129, Sec. 53.

The problem before us, as is so often the case, lies not chiefly in the ascertainment of the applicable rules of law, but in their application to the facts.

The contentions of the Company are conveniently summarized in the following table from its brief:

### TABLE

"Return found by Commission ........ $10,064,075
(Percent of $179,250,000 rate base—5.61%).
Overstatement of above return through erroneous rulings of the Commission as to operating expenses properly includable on a test year basis:

|  |  |
|---|---|
| Additional Federal income tax ...... | $ 118,000 |
| Additional wage costs ............. | 105,000 |
| Additional fuel costs .............. | 191,000 |
| Promotional expenses disallowed .... | 80,000 |
| Federal income taxes deferred because of accelerated depreciation ........ | 353,000 |
| Total | $ 847,000 |

A.  Return which can be earned under present rates  ................... $ 9,217,075

B.  Additional amount required to produce a return equal to 5.8% on the rate base  ...................... 1,179,425*

5.8% return on the $179,250,000 rate base found by the Commission .... $10,396,500

*At the current 52% Federal income tax rate, a rate increase of over $2,450,000 would be required to produce this return."

We here note that for the purposes of this case an income tax rate of 52% is applicable to all of the charges in operating expenses and to any additional amount necessary to produce a given return on the rate base. To bring 48 cents additional into the return upon the rate base requires $1.00 in revenue from the customer.

For the Company, the Commission, and the Court, the income tax is neither more nor less than an inescapable fact. Without question, the income tax is properly charged against utility operating revenues for rate making purposes. In other words, the return on the rate base must be computed after deduction of the income tax.

*Additional Federal Income tax*—$118,000.

The Company urges that the reduction in income tax arising from losses and expenses chargeable against *taxable income,* but not against *public utility operating revenue,* should be a charge against such operating revenue, or, in other words, taken as an operating expense for rate making purposes. The argument is this: The Company lost $209,000 on merchandising operations and made charitable contributions of $17,000 in the test year of 1956. Applying the items against income from utility operations resulted in reducing the corporate federal income tax otherwise payable on the utility taxable income by 52% (the tax rate) x $226,000 (total of the item) or about $118,000.

It is agreed that merchandising losses and gains are neither to be subtracted from nor to be added to utility operating income for rate making purposes. Gains and losses of this type are taken and borne by the stockholders and not the ratepayers. In like manner, contributions to charity come from the stockholders.

The reduction in income tax obviously arises from the impact of the merchandising loss and contributions upon the utility income. Without the latter there would be no income tax to be saved. The Company would have it that the ratepayers should make good to the stockholders such tax reduction. The net amount which the Company seeks from increased rates to cover these items is $118,000. By operation of the 52% income tax an increase of $246,000 would be necessary to yield the desired amount.

The Company is not compelled to remain in the merchandising business, nor need it give its money to charities, no matter how deserving. If it chooses to run two distinct types of business—the one a public utility and regulated, and the other private and unregulated—in one corporate organization, it seems to us entirely reasonable that the income tax chargeable to the utility business for rate making purposes should be no more than the total tax on the corporation. The stockholder has an equity in both the utility and non-utility properties. He is interested in the profits and losses from both types of operations. The surplus exists as a source of strength for the utility as well as the private business. Any significant reduction therein harms the Company, hence the utility operation, and in the long run the ratepayers.

We are not here concerned with the treatment of so-called income taxes deferred. There was no error by the Commission in refusing to charge this item against operating revenue.

*Additional Wage Costs*—$105,000.

We have held under "additional federal income tax" that the tax savings in question were properly disallowed as an operating expense for rate making purposes. "Additional Wage Costs" present a different problem. Here the inclusion of wages generally in expense is obvious. The issue

is whether a wage increase effective after the test period is to be treated as such an expense.

The Commission refused to include a net item of $105,000 for additional wage costs in its forecast of expenses. By net item we mean the wage increase urged less the income tax reduction therefrom. In brief, $220,000 (wage increase) less $115,000 (52% income tax on $220,000) equals $105,000.

As we read the record, the Commission agrees that under the Company's contract with its employees, in force in 1956, there will be a wage increase in 1957 after the close of hearings in the instant case. There is the finding in the decree that "Wages will increase in 1957." The refusal to include this item in operating expenses is based on two grounds: (1) the increase was not effective in whole or in part in the test year of 1956, and (2) the estimates of cost of operation should be unchanged from the costs in fact of the test year, at least without opening the record to every type of change that might occur in the future.

The Commission in its decree said:

> "We cannot agree that the 1956 expenses should be adjusted upward to include oil and other costs which may be incurred in the year 1957, unless all other figures are varied to take into consideration the effects which might be expected in 1957. It would be impossible from the Record to establish a satisfactory 1957 rate base. It also would be impossible without a great deal of mere conjecture to arrive at fair 1957 revenues and expense items. We believe it to be fairer and more reasonable both to the Company and to the public, and in keeping with the usual practice, where we are so close to the end of the recent year, to use actual figures, rather than speculating as to 1957 possibilities."

A further reason advanced for tying closely to the actual experience of the test year in projecting revenue and ex-

pense in the future, is that the estimated increase in utility revenues will take care of the estimated increase in expense.

In the case of the wages, we know with the maximum degree of certainty attainable in a forecast that in the period for which rates are to be set there will be an increase in net expense. To ignore this probability is to defeat the very idea of fixing rates for the future upon intelligent and informed estimates. Why should a probability such as this be set aside in favor of the experience of the test year, which we know with certainty will not be repeated in the future? The experience of the test year is at best a "guess" for the future. If we can make the "guess" more in line with the probability, in the long run we will have benefited both public and Company. Much obviously must be left to the sound judgment and experience of the Commission. When, however, the Commission refuses to include in its estimates expenses so plainly observable, we must conclude that it has improperly interpreted the evidence.

The governing principle was set forth by the Vermont Court, in approving the test year method, in adopting these words from a Commission report:

"... the propriety of the petitioner's proposed rate in relation to the present time and the immediate future can most reasonably be ascertained from a study of its operations during the most recent time for which data is available, with proper adjustments to show what results such operations would produce in the light of presently known factors relating to operating cost and revenues."

*Petition of Central Vermont Pub. Serv. Corp.,* 116 Vt. 206, 71 A. (2nd) 576.

In the instant case an operating expense to complete the funding of certain pension liabilities in 1956 was properly eliminated by both Company and Commission in the use of the 1956 test year. In like manner, the wage increase must be included.

The Nevada Court, in *Bell Telephone Company of Nevada* v. *Public Service Commission*, 70 Nev. 25, 253 P. (2nd) 602, 608 (decided in 1953), said:

> "Any order as to rates must perforce operate for the future. It cannot act retroactively. A failure to take into consideration the very material increase in operating expenses resulting from these two items again presents a false picture with reference to the future earnings the company may expect. . . . . Without an honest and intelligent forecast as to probable tax, price, and wage levels in the immediate future, the fixing of rates would be a futility."

See also *McArdle* v. *Ind. Water Co.*, 272 U. S. 400, 408, in which we read:

> "But in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation; and, in the light of all the circumstances, there must be an honest and intelligent forecast as to probable price and wage levels during a reasonable period in the immediate future. In every confiscation case, the future as well as the present must be regarded. It must be determined whether the rates complained of are yielding and will yield, over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation and for a reasonable time in the immediate future. *S. W. Tel. Co.* v. *Pub. Serv. Comm.*, 262 U. S. 276, 287, 288; *Bluefield Co.* v. *Pub. Serv. Comm.*, 262 U. S. 679, 692. *Cf. Board of Utility Commissioners* v. *New York Telephone Co.*, 271 U. S. 23, 31."

The Commission argues in its brief:

> "The use of actual figures is the best method to use when fairly possible and is well substantiated

> by the practice of the Commission and this Court ... This was done in this case, so that the Decree rendered on March 15, 1957 spoke of actual figures in the year 1956. It was not necessary to estimate what repairs might be carried on in a future month, nor how much oil might be burned, nor how many men might be employed, and so on."

In *Gay* v. *Water Co.*, 131 Me. 304, 162 A. 264, cited by the Commission, the precise question here raised does not appear to have been in issue. The point is that the actual figures of the test year on wages plainly do not provide a reasonable basis for judgment on future expense.

We conclude, therefore, that the Commission erred in not including an amount for additional wages in operating revenues, and hence the exceptions covering this issue must be sustained. It is for the Commission, not for us, to determine on the present record before it the amount of such additional wages and to make the proper adjustments arising therefrom in establishing rates for the Company.

*Additional fuel costs—$191,000.*

During the test year 1956 it appears from the record that the price of oil per barrel rose from $2.55 to $2.95. In its brief, the Company seeks to include in the record an increase of 25 cents in January 1957 on the strength of the Commission's statement:

> "We can take judicial notice of the fact that oil prices have increased and may further rise or may sharply drop."

With this view of judicial notice we cannot agree. The statement is general in nature and does not serve to bring a particular price rise into the record. The Company contends that the estimates of expense should include the cost of oil at the January 1957 price of $3.20, or, in any event at the price at the end of the test year of $2.95. The Com-

mission, however, adopted the total cost of oil in 1956, thus bringing the average cost per barrel below the year end price.

There is a surface resemblance, but no more, between "additional wage costs" and "additional fuel costs." In each instance the Company seeks to adjust the costs in fact of the test year 1956 to make a fair estimate for the future. The difference between the items, however, is wide and basic. On the one hand, the wage adjustment is founded upon a firm contract known in the test year and effective thereafter. On the other hand, the fuel or oil adjustment rests solely on estimates of the future market price of oil beyond the experience of the test year.

There are solid grounds, in our opinion, for sustaining the action of the Commission. First, the experience of the test year should not be cast aside except upon a strong showing of its weakness as a measure for the future. Important as it is to the Company, oil is only one item in the cost of operation. Oil prices may strengthen or soften. No one can with certainty determine the price in the future. Of one fact, all can be certain; namely, that oil cost the Company a stated number of dollars in 1956, the test year adopted by both Company and Commission. Second, the substitution of fact for prophecy at any point in the process of rate making is an advance on the road to certainty. There is, of course, in the acceptance of the 1956 costs no implication of a finding or of an opinion that the price of oil will stay at a fixed level. It yet remains that with the use of test year costs of items fluctuating in price, the projection of costs into the future is based upon the facts of the recorded past. The Commission did no more than tie its estimates of income and expense to the test year.

It is urged by the Company that the Commission is inconsistent in its treatment of oil cost in light of its decree in *Re Lewiston Gas Light Co.*, F. C. #1516, entered on the

same date as the decree in the instant case. In the *Lewiston Gas Light* case the Commission in using 1957 as the test year (including actual experience for a brief period and several months based on estimates only) took oil at the market price in the period of actual operations in 1957. We touch upon the *Lewiston Gas Light* case only for purposes of illustration. In March 1957 the Commission on a record with a test year of 1957 properly could take oil costs experienced in the test year 1957, and on a record with a test year of 1956, in like manner the costs experienced in the test year 1956.

Further, the Commission, charged as we have often said with the finding of the facts, was justified in our view in considering that the growth in gross revenues would care for any increase in the cost of oil. The Company on its part pointed out that in 1956 operating income increased $1,-994,000 and operating expense $2,231,000, or, in other words, that increased expense more than offset increased income. It may be noted, however, that $353,000 for income tax deferred, disallowed by the Commission, was included in the expense. If we deduct this item, we find in 1956 the increase in income exceeded and was not offset in full by the increase in expense. We cannot say that the Commission erred as a matter of law on this point. The issue does not lend itself to absolute certainty.

In whatever manner we approach the problem of rate making, we cannot escape prophecy. What will the Company earn in the future? What does the Company require in rates to produce that which it is entitled to earn? The efforts of regulatory commissions, and courts as well in their field, should be directed to a reduction and not to an increase in the weight of prophecy.

In reaching our conclusion on this issue we do not depart from the principles so well stated by Justice Cardozo who, in speaking for the Supreme Court of the United States, in

*West Ohio Gas Company* v. *Public Utilities Commission of Ohio*, 294 U. S. 79, 79 L. ed. 773, said, at p. 81:

> "We think the adoption of a single year as an exclusive test or standard imposed upon the company an arbitrary restriction in contravention of the Fourteenth Amendment and of 'the rudiments of fair play' made necessary thereby . . . The earnings of the later years were exhibited in the record and told their own tale as to the possibilities of profit. To shut one's eyes to them altogether, to exclude them from the reckoning, is as much arbitrary action as to build a schedule upon guesswork with evidence available. There are times, to be sure, when resort to prophecy becomes inevitable in default of methods more precise. At such times, 'an honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances' . . . is the only organon at hand, and hence the only one to be employed in order to make the hearing fair. But prophecy, however honest, is generally a poor substitute for experience. 'Estimates for tomorrow cannot ignore prices of today.' . . . We have said of an attempt by a utility to give prophecy the first place and experience the second that 'elaborate calculations which are at war with realities are of no avail.' . . . We say the same of a like attempt by officers of government prescribing rates to be effective in years when experience has spoken. A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment."

In stating the facts Justice Cardozo also said:

> "To ascertain the gross income and the operating expenses the commission confined itself to the business in 1929, predicting on that basis the income and expenses to be looked for in the years to follow. Besides the figures for 1929, there was evidence, full and unchallenged, as to the actual revenue and outlay for 1930 and 1931. The commis-

sion refused to give any heed to that evidence in fixing the new rates."

The difference between *West Ohio* and the instant case is at once apparent. In our case the estimates are based on the experience of the immediate, not the distant, past. In short, 1956 is the test for 1957.

To summarize:

We start here with a test year—1956. The past has been recorded and the record is open to provide the facts of the immediate past as the basis for estimating operations in the immediate future. Plainly, facts which no longer have life in the future must be discarded, e.g., payments for pension amortization. So also facts which with certainty will gain life in the future, but do not affect the operations of the test year, must be weighed by the fact finder, e.g., the wage increase under the firm contract.

We come then to the great mass of items, both of income and of expense, in the operation of the Company. An increase in gross income may be anticipated from the record of a growing and expanding company. Increased use will produce increased revenue, at least to meet costs on the basis of the test year. Further, it seems to us that the Commission, here charged with the duties of regulation, properly concluded that estimated increase in revenue would absorb increases in costs. That this conclusion could not be reached with the precision and exactness of the answer to a problem in mathematics, does not deprive it of validity as an estimate in rate making.

The test year in the instant case is the very period within which the case was heard by the Commission. It is the annual period immediately preceding the decision. If the Commission adjusts the results of the test year to meet facts, i.e., the wage increase, and the pension amortization, it is on firm ground. To do more, with reference of course

to admittedly proper items of expense, would destroy or seriously weaken the effectiveness of the test year, a valued and respected tool in rate making.

We find no error on the part of the Commission in refusing to allow additional fuel costs above the costs of the test year. The exceptions with reference thereto are overruled.

*Promotional expenses disallowed—$80,000.*

The Commission made the following findings and rulings:

"The Company spent for the year 1956 the sum of $297,649 for sales promotion and all of this has been claimed as an electric operating expense according to the various exhibits offered by the petitioner . . . We exclude a gross amount of $166,-700, or a net of $80,000 of this expense for rate purposes. We do not mean to infer in any way that the management may not continue to carry on such costs, so long as the cost falls on the shoulders of the stockholders, who will be the ones to benefit from the effectiveness of such programs."

This item differs among other respects from the items previously discussed in that here we have an actual expense of the test year 1956 disallowed in forecast of future expenses. Additional income taxes, wage costs and fuel costs were expenses which the Company sought to add to the expenses in fact of the test year.

The Company's objections to the findings and rulings are twofold; first, they constitute an invasion of management, and second, they lack any supporting evidence.

The applicable rules are well understood. The following are illustrative statements:

"Good faith is to be presumed on the part of the managers of a business. . . In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay. . . The suggestion is made that there is no evidence of competition.

> We take judicial notice of the fact that gas is in competition with other forms of fuel, such as oil and electricity. A business never stands still. It either grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others . . . When a business disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service."

*West Ohio Gas Co.* v. *Public Utilities Commission,* 294 U. S. 63, 72.

> "The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. . . This rule is recognized in all of the cases. This matter of salaries and advertising expense calls for the exercise of judgment on the part of the management of the company. Good faith on its part is to be presumed. Although these expenses should be scrutinized with care by the commission they should not be disallowed or reduced unless it clearly appears that they are excessive or unwarranted or incurred in bad faith."

*Petition of New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A. (2nd) 135, 145.

The good faith of the management of the Company is not challenged in the slightest degree. The question is whether "it clearly appears that the expenses are excessive or unwarranted," or, stated differently, whether expenses in excess of the allowance by the Commission are "within the limits of reason."

In our discussion of this exception we are not concerned with the particular purpose and amount of each charge within the item. In general, promotional expense of the nature under discussion may properly be charged to operations.

The accounts of the Company for the test year show in round figures for sales promotion expenses; commercial de-

partment $147,000, industrial development department $61,000, public relations department $89,000, total $297,000.

From the accounts it plainly appears that the following specific items were disallowed by the Commission:

"COMMERCIAL DEPARTMENT

| | |
|---|---:|
| Administrative | $ 24,602.45 |
| Commercial Lighting | 65,730.23 |
| Commercial Heating, Cooking and Refrigeration | 6,982.18 |
| Farm Service | 15,642.53 |
| Demonstration and Home Service | 27,412.92 |
| Kitchen Planning | 31.16 |
| Domestic | 6,427.96 |

$146,829.43

"PUBLIC RELATIONS DEPARTMENT

| | |
|---|---:|
| Institutional Advertising | 19,442.05 |
| Institutional Displays | 410.56 |

$166,682.04"

The Commission thus struck out the total expense of the commercial department and allowed the total expense of the industrial development department and the expenses for public relations, less the items for institutional advertising and display.

The Commission, in our view, in striking the specific items of $167,000 from the test year total expense of $297,000 unreasonably substituted its judgment for that of management. The items struck were not, as we read the decree, considered by the Commission to be as a whole improper or unlawful charges against the ratepayers. The Company was left by the Commission with a permitted allowance of $130,000, or less than 50% of its prior experienced expense to meet the needs in the promotional field.

To place such a reduction chiefly on the ground that an expanding utility such as the Company should so severely reduce expense of this type, is clearly a substitution of the Commission for the Company in the management of the utility.

It is unnecessary in our view to consider each charge in detail. The exceptions by the Company covering this item must be sustained. From the record, the Commission will determine the allowance for this item, with proper adjustments in establishing rates for the Company.

*Federal income tax deferred because of*
*accelerated depreciation—$353,000.*

In our consideration of operating expenses we come to "income tax deferred," to use the Company's terminology, in the amount of $353,000 arising from accelerated depreciation. It may be noted that this item does not represent a tax saving in fact from offset of loss against income, or actual incurred expense such as wages, or oil. As the name indicates, the item, in the opinion of the Company, is an expense to be incurred in later years for which provision ought to be made from today's ratepayers.

Briefly, the situation is this: The Commission charges depreciation for rate making purposes on the straight-line method, and permits (there is no indication that the Commission requires) accelerated depreciation for income tax purposes. In each method the depreciation is spread over the life of the property; in equal installments in straight-line depreciation, and in greater than average amounts in early years under the accelerated methods. The sum-of-the-years-digits method discussed in the Company's brief is one variation of accelerated depreciation.

There is no controversy between the Company and the Commission about the allowance of straight-line depreci-

ation for rate making and the allowance of accelerated depreciation for income tax purposes.

The Company's proposal comes to this:

(1) Depreciation for rate making purposes as at present, "straight-line.";

(2) Depreciation for income tax purposes, at accelerated depreciation, e.g., "sum-of-the-years-digits" method;

(3) The income tax as an operating expense for rate making purposes to be "normalized" at the level produced by straight-line depreciation;

(4) The "normalized" tax to consist of (a) the actual tax, plus (b) the tax reduction arising from use of the accelerated depreciation in early years, or "income tax deferred.";

(5) The balance of "income tax deferred" (in effect an interest free loan to the Company) to be deducted from the value of the property in establishing the rate base;

(6) "Income tax deferred" to be a reserve to provide the difference between actual less "normalized" tax in the later years.

We are unable to agree with the argument for the Company, which is in substance this: (1) in years to come the taxes deferred will be payable and fairness requires equalization of the tax load between present and future ratepayers; (2) Congress, in enacting Section 167 of the Internal Revenue Code of 1954 liberalizing depreciation allowance, intended that the benefit should accrue to the taxpayer and not to the customer or ratepayer as here; (3) "normalization" of income taxes under accelerated amortization (Sec. 168 of the Code, *supra*) requires like treatment here.

From our reading of Section 167 of the Code, *supra,* and the House and Senate Committee reports thereon, to which

the Company has directed our attention, we are unable to find an intent on the part of Congress that the ratepayers of a regulated utility should provide an interest free loan to the Company through present payment of a deferred tax. We must not read more into the Act than reasonably may there be found. 3 U. S. Code Cong. & Adm. News, 83rd Congress, Second Session (1954), House pg. 4048, Senate pg. 4654.

The Company also points to the treatment of accelerated amortization and income taxes by the Commission. Under Section 168 of the Code, *supra,* certain properties may be written off in whole or in part in a five year period. The Commission has permitted the "normalization" of income taxes resulting therefrom, and it is now urged that a like principle governs the "income tax deferred" under discussion.

There are, however, wide differences between the programs. First, accelerated amortization—the quick write-off—bears no relation to the life of the property. It fairly appears that Section 168 was a measure designed to aid the defense effort. Second, in the accelerated depreciation program the cost is recovered during the life of the property precisely as with the straight-line method. In short, accelerated amortization with its quick write-off and limited period of operation is not like accelerated depreciation with its change of pace, but no more, in recovery of cost over the full life of the property.

The proper treatment of depreciation and taxes calls for the exercise of judgment by those trained in the field of utility regulation. There are choices to be made in the impact of both depreciation and taxes upon the present and future ratepayers. The Commission, apart from the matter of accelerated amortization, has allowed only the current income tax as a charge in rate making. It takes the position in substance that the creation of an income tax deferred

reserve under the circumstances outlined would extend into the unforeseeable future charges to provide for expenses which might never arise, or to meet which, when and if the need should arise, the Company could seek relief before the Commission. There is nothing unreasonable in the conclusion reached. For example, a reduction in the tax rate might substantially lessen any anticipated impact on future ratepayers. Rates do not stand forever, and corrections may be made from time to time.

Whether it would be proper for the Company to employ the same method of depreciation for both rate making and income tax we need not, nor do we, consider. We here do no more than approve as a matter of law the ruling of the Commission refusing to allow the requested charge for "income tax deferred" against income.

No decision of a court of last resort on this issue has been called to our attention. In the following cases the problem is fully discussed: *City of Pittsburgh* v. *Pennsylvania Public Util. Com'n.* (Pa. Superior Court), 128 A. (2nd) 372 (denying "normalization" of taxes from accelerated depreciation); *Re Amere Gas Utility Co.*, Docket G-6358 (F. P. C. 1956) 15 PUR (3rd) 339 (accounting case with indication of approval of "normalization"); *The Effect on Public-Utility Rate Making of Liberalized Tax Depreciation Under Section 167*, 69 Harv. Law Rev. 1096 (1956); *Economic and Regulatory Aspects of Accelerated Depreciation* (Guercken) 58 P. U. Fortnightly 145 (August 1956).

The exceptions of the Company covering this item are overruled.

*Rate of Return*—5.61%.

The Commission found a rate of return of 5.61% on the rate base was "more than fair and reasonable" on the basis of the evidence before the Commission in the instant case.

The Company's objection to the finding is that it was without support of any substantial evidence and was unfair and unreasonable.

There is no controversy about the applicable rule of law. The Company is entitled to a fair return, and less than a fair return would be confiscatory. We are not here concerned with any limiting factor upon a rate of return imposed by maximum reasonable worth of service. See *Hamilton* v. *Power Co.*, 121 Me. 422, 117 A. 582.

Fair return has been defined and discussed in the following illustrative cases:

> "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

*Bluefield Co.* v. *Public Service Commission*, 262 U. S. 679, 692-693, 67 L. Ed. 1176, 1182-83.

> "By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

*Federal Power Commission* v. *Hope Natural Gas Co.,* 64 S. Ct. 281, 288, 88 L. Ed. 333, 345.

"It is repeatedly stated or implied in the decided cases, so far as we know without contradiction, that one of the constitutional rights of a regulated utility is the right to earn a sufficient return to maintain its credit and to obtain additional capital when needed to enable it to serve its public."

*New England Tel. & Tel. Co.* v. *Department of Public Utilities,* 327 Mass. 81, 94, 97 N. E. (2nd) 509, 516.

"The public properly demands service and to fulfill these demands the Company must expand. It cannot serve or expand if its financial structure does not attract confidence."

*Central Maine Power Co.* v. *P. U. C.,* 150 Me. 257, 277, 109 A. (2nd) 512.

It will serve no useful purpose in our view to review the mass of testimony from financial experts on the rate of return necessary to support the enterprise and attract new capital. There is no warranty of certainty in matters of this nature.

Much stress is placed by the Company upon the decision of the Commission fixing the rate of return at 5.8% in the 1953 Rate Case, in which the Commission thoroughly covered all aspects of the Company's operations. It was reversible error on the evidence, says the Company, to reduce the rate below the 1953 level.

The Commission, in its decree, said:

"A great deal of evidence is contained within the confines of the Record in regard to rate of return. Mr. Kosh and Dr. Foster, both expert witnesses with considerable experience in the field, produced detailed exhibits and explained their varying points of view in their testimony. In general, Mr. Kosh concluded that a fair rate of return to this

Company under present conditions should be between 5.25% and 5.5%. Dr. Foster, on the other hand, maintained that a fair rate should not drop below 5.8%, as requested by the Company."

The Company contends that the Commission, without the support of any substantial evidence, failed and refused to recognize facts, summarized as follows:

The requirements for working capital increased since the 1953 Rate Case. Through changes in the due dates of the corporate income tax, the Company lost benefits from income tax accruals through the year. A larger and more costly inventory was required, and in particular an oil inventory with oil no longer purchased on consignment. The 1957 rate base included a relatively smaller proportion of "current value" (R. S. Chap. 44, Sec. 18) than the 1953 Rate Case.

In brief, the Company argues that the 1957 rate base, acceptable to it in this case, is a minimum rate base and that therefore a higher return than (or at least a return not less than) 5.8% is required.

There was no error, however, in not including additional working capital or giving greater weight to the "current value" factor in the 1957 rate base. The Company in effect would have us make additions to the base, but this cannot presently be done. The issue is not whether the 1957 rate base was correctly computed, but what shall be the rate of return thereon.

The rate of return of a utility is not, and in this the Company does not disagree, static. The 1953 Rate Case decree did not fix 5.8% as the point of departure for 1957. It was admissible in evidence, and in absence of other testimony no doubt would have strong persuasive value for the fact finder. Here the Commission had before it the testimony of experts in the field of utility financing—"fair return" experts. They testified upon the financial requirements of the

Company and gave their opinion upon the rate of return necessary to insure a fair and reasonable return upon the rate base.

Would we, sitting as finders of fact, have fixed the rate of return at 5.61%? This is not the question before us. Our authority and function in cases arising on exceptions from the Commission are found in the statutes and rules of law stated at the outset of the opinion.

We find no reason in law why the Commission in the exercise of its appointed task could not accept the evidence of the one expert and reject the evidence of the other. Having accepted the views of Mr. Kosh, it could properly reach a rate of return of 5.61%. Nor can we say that the line between a fair and unfair return lies at 5.8%, or at a point above 5.61% on the 1957 rate base. The exception relating to the rate of return is overruled.

*Summary:*

The Commission is upheld and exceptions overruled on issues relating to income tax saved or deferred, additional fuel costs, and rate of return.

The Commission is overruled and exceptions sustained on issues relating to additional wage costs and promotional expenses.

The entry will be

> *Exceptions sustained.*
> *Case remanded to Public Utilities Commission for a decree upon the existing record in accordance with this opinion.*